# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Board of Education of Rich Township High School District No. 227 v. Illinois State Board of Education, 2011 IL App (1st) 110182**

---

| | |
|---|---|
| Appellate Court Caption | THE BOARD OF EDUCATION OF RICH TOWNSHIP HIGH SCHOOL DISTRICT NO. 227, Plaintiff-Appellant, v. ILLINOIS STATE BOARD OF EDUCATION; JESSE H. RUIZ, Board Chair; CHRISTOPHER J. WARD, Vice Chair; VINNI M. HALL, Board Secretary; JAMES W. BAUMANN, Member; ANDREA S. BROWN, Member; DAVID L. FIELDS, Member; STEVEN R. GILFORD, Member; LANITA J. KOSTER, Member; MELINDA A. LABARRE, Member; CHRISTOPHER KOCH, State Superintendent of Education; and SOUTHLAND COLLEGE PREP CHARTER SCHOOL, INC., Defendants-Appellees. |
| District & No. | First District, Sixth Division<br>Docket No. 1-11-0182 |
| Filed | December 30, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In proceedings arising from defendant's application to open a charter school within the boundaries of plaintiff school district, the trial court's judgment confirming the decision of the Illinois State Board of Education to reverse the school district's denial of the application and approve the proposal was affirmed on the grounds that the proposal was in compliance with the Charter Schools Law and in the best interests of the students it was designed to serve. |

<table>
<tr><td>Decision Under Review</td><td>Appeal from the Circuit Court of Cook County, No. 10-CH-27012; the Hon. Stuart E. Palmer, Judge, presiding.</td></tr>
<tr><td>Judgment</td><td>Affirmed.</td></tr>
<tr><td>Counsel on Appeal</td><td>Anthony G. Scariano, Daniel P. Field, and Adam Dauksas, all of Scariano, Himes & Petrarca, Chtrd., of Chicago, for appellant.<br><br>Lisa Madigan, Attorney General (Michael A. Scodro, Solicitor General, and Mary E. Welsh, Assistant Attorney General, of counsel), and Robert R. Hall, Jr., and Brandon K. Lemley, both of Querrey & Harrow, both of Chicago, for appellees.</td></tr>
<tr><td>Panel</td><td>JUSTICE GARCIA delivered the judgment of the court, with opinion.<br>Presiding Justice R. Gordon and Justice Lampkin concurred in the judgment and opinion.</td></tr>
</table>

## OPINION

¶ 1    The defendant Southland College Prep Charter School, Inc. (Southland) submitted an application to the plaintiff the Board of Education of Rich Township High School District No. 227 (District 227) to open a charter school within its boundaries in the fall of 2010. District 227 rejected Southland's proposal in February 2010. Pursuant to the Illinois Charter Schools Law (105 ILCS 5/27A-1 *et seq.* (West 2008)), Southland appealed the denial to the defendant Illinois State Board of Education (ISBE). In June 2010, the ISBE ruled Southland's proposal was both in compliance with the requirements of the Charter Schools Law and in the best interests of the students it was designed to serve and reversed the decision of District 227. District 227 filed a complaint for administrative review, which the circuit court of Cook County rejected. In the fall of 2010, the students of the first class at Southland College Prep Charter School began their studies.

¶ 2    Before this court, District 227 contends Southland's proposal did not satisfy three of the statutory requirements to win approval from the ISBE. It also contends the establishment of the charter school is not in the best interests of the students of the district. Finally, District 227 asserts the ISBE did not comply with procedural rules in the Illinois Administrative Code during Southland's appeal, which it contends supports a constitutional due process claim. We affirm.

¶ 3                                        BACKGROUND

¶ 4        In November 2009, Matteson School District 162 (District 162), which has 3,500 students in seven "feeder" elementary schools that enroll in District 227's three high schools, sent correspondence to the ISBE about establishing a charter high school for its students. On December 14, 2009, Southland, formed by educational leaders of District 162, submitted an application to District 227 to establish a charter high school. Southland planned to open the doors of the new high school in the fall of 2010.

¶ 5        The proposal stated, "[The] metamorphosis of the student population and student achievement in Matteson School District No 162 *** during the past several years has served as the catalyst for the movement to ensure that the rigorous, college preparatory curriculum to be provided at Southland College Prep Charter High School will become a reality for students in District 162 and surrounding elementary school districts that matriculate into Rich Township High School District 227." According to the proposal, the vast majority of the 3,500 students in District 162 are African-American and more than 68% of its students are economically disadvantaged, as measured by participation in the federal free and reduced lunch program. The proposal asserted, "[The] leaders in District 162 have concluded that the proposed Southland College Prep Charter High School is needed so that area students will have the opportunity to attend a small, academically rigorous, college preparatory charter high school that will provide a necessary educational option for those students who will achieve their full academic potentials only in such an environment."

¶ 6        Southland contended its proposal to establish the charter high school was economically sound because in fiscal year 2010, District 227 had direct revenues totaling $61,724,196, with an operating fund balance of $42,443,406. The proposal averred that in light of the $42 million fund balance, "the maximum financial impact the Southland College Prep Charter High School would have on the District would be approximately 6% of the amount of the District's current operating fund surplus." The proposal contended District 227's expenses would be mitigated by a reduction in the number of students attending District 227's three high schools.

¶ 7        The proposal set forth a list of goals, objectives, and pupil performance standards, as well as a description of Southland's educational program, school days, and hours of operation. The proposal provided: "Each family at Southland College Prep Charter High School must sign a contract with Southland College Prep Charter High School setting forth the parents' and students' commitment to work with Southland College Prep Charter High School to achieve maximum student outcome."


¶ 8                                     Charter Schools Law

¶ 9        The Illinois General Assembly enacted the Charter Schools Law in 1996 in response to "mounting calls for public education reform." *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455, 458 (2005). The intent of the Charter Schools Law is to "promote new options within the public school system and [to] provide pupils, educators, community members, and parents with the stimulus to strive for educational excellence." 105 ILCS 5/27A-2(a)(3) (West 2008).

¶ 10    The Charter Schools Law aims to, *inter alia*, (1) "improve pupil learning by creating schools with high, rigorous standards for pupil performance," (2) "increase learning opportunities for all pupils, with special emphasis on expanded learning experiences for at-risk pupils, consistent, however, with an equal commitment to increase learning opportunities for all other groups of pupils in a manner that does not discriminate on the basis of disability, race, creed, color, gender, national origin, religion, ancestry, marital status, or need for special education services," (3) "encourage the use of teaching methods that may be different in some respects than others regularly used in the public school system," (4) "provide parents and pupils with expanded choices within the public school system," and (5) "hold charter schools accountable for meeting rigorous school content standards and to provide those schools with the opportunity to improve accountability." 105 ILCS 5/27A-2(b) (West 2008). To achieve these aims, the legislature has declared that the Charter Schools Law "should be interpreted liberally to support the findings and goals [of the Charter Schools Law] and to advance a renewed commitment by the State of Illinois to the mission, goals, and diversity of public education." 105 ILCS 5/27A-2(c) (West 2008).

¶ 11    The Charter Schools Law provides for student matriculation similar to other public schools. "Enrollment in a charter school shall be open to any pupil who resides within the geographic boundaries of the area served by the local school board." 105 ILCS 5/27A-4(d) (West 2008). In the event "there are more eligible applicants for enrollment in a charter school than there are spaces available, successful applicants shall be selected by lottery." 105 ILCS 5/27A-4(h) (West 2008).

¶ 12    Funding would come from the local school district. "[T]he charter school and the local school board shall agree on funding and any services to be provided by the school district to the charter school." 105 ILCS 5/27A-11(b) (West 2008). The Charter Schools Law sets forth funding guidelines: "In no event shall the funding be less than 75% or more than 125% of the school district's per capita student tuition multiplied by the number of students residing in the district who are enrolled in the charter school." *Id*. The General Assembly provided "that funding and service agreements under this subsection *** shall be neither a financial incentive nor a financial disincentive to the establishment of a charter school." *Id*.

¶ 13    The Charter Schools Law contemplates the state contributing to charter school funding. The ISBE is authorized to provide "transition impact aid" to "school districts that approve a new charter school or that have funds withheld by the State Board to fund a new charter school that is chartered by the State Board." 105 ILCS 5/27A-11.5 (West 2008). However, the General Assembly did not appropriate transition impact aid for 2010 or 2011.

¶ 14    A charter school proposal is initiated by the individuals or organizations "that will have majority representation on the board of directors or other governing body of the corporation or other discrete legal entity that is to be established to operate the proposed charter school." 105 ILCS 5/27A-7(b) (West 2008). A proposal must satisfy 15 requirements set out in section 27A-7(a) of the Charter Schools Law to win approval. 105 ILCS 5/27A-7(a) (West 2008).

¶ 15    Within 45 days of receipt of a charter school proposal, the local school board must convene a public meeting to solicit information on whether to grant or deny the proposal. 105

-4-

ILCS 5/27A-8(c) (West 2008). In evaluating the charter school proposal, the local school board must give preference to proposals that (1) "demonstrate a high level of local pupil, parental, community, business, and school personnel support," (2) "set rigorous levels of expected pupil achievement and demonstrate feasible plans for attaining those levels of achievement," and (3) "are designed to enroll and serve a substantial proportion of at-risk children." 105 ILCS 5/27A-8(a) (West 2008). Within 30 days of the initial public meeting, a second public meeting must be held where the local school board votes on the proposal. 105 ILCS 5/27A-8(e) (West 2008). Following its decision, the local school board must submit a report to the ISBE within seven days. 105 ILCS 5/27A-8(f) (West 2008).

¶ 16    If the local school board approves the proposal, the ISBE has 14 days to review the decision for compliance with the Charter Schools Law to issue its certification. *Id*.

¶ 17    If the local school board denies the proposal, the charter school may appeal to the ISBE within 14 days. 105 ILCS 5/27A-9(e) (West 2008); 23 Ill. Adm. Code 650.60(a) (2011). Once an appeal is filed, the ISBE may direct the parties to provide additional information. "The parties shall submit to the State Board such additional information as the State Board determines is necessary to decide the appeal." 23 Ill. Adm. Code 650.60(b) (2011). A charter school proposal may be subject to revision before the ISBE. "The [ISBE] shall provide technical assistance to persons and groups preparing or revising charter applications." 105 ILCS 5/27A-11(f) (West 2008).

¶ 18    The Illinois Administrative Code provides the opportunity for the charter school and the local school board to address the ISBE, either by oral or written presentations. The ISBE may require such a presentation even in the absence of a presentation request by the charter school or the local school board. 23 Ill. Adm. Code 650.60(c) (2011).

¶ 19    The ISBE may reverse the local school board's denial of a charter school proposal when two conditions are met: (1) the proposal is in full compliance with the Charter Schools Law; and (2) the proposal is in the best interests of the students it is designed to serve. 105 ILCS 5/27A-9(e) (West 2008). If the ISBE adopts the charter school proposal against the wishes of the local school board, the ISBE "shall act as the authorized chartering entity for the charter school." 105 ILCS 5/27A-9(f) (West 2008). As the authorized chartering entity, the ISBE must approve and certify the charter, and "shall perform all functions under [the Charter Schools Law] otherwise performed by the local school board." *Id*.

¶ 20    Final decisions of the ISBE are subject to judicial review under the Administrative Review Law. 105 ILCS 5/27A-9(e) (West 2008).


¶ 21                                    Southland's Proposal

¶ 22    On January 20, 2010, at the first public meeting before District 227, public officials and residents were given the opportunity to comment on the merits of Southland's proposal. On the day of the public meeting, Southland hand delivered a revised proposal to District 227, modified to enroll "200 to 250 students in the Southland College Prep Charter High School each year, with maximum total enrollment of 1000 rather than 800 students, based upon the overwhelming response from parents in the District 227 community indicating that a 1000-student school is required in order to serve the needs of area students." The revised proposal

also included petitions signed by residents of District 227 in support of the charter school.

¶ 23    On February 16, 2010, District 227 held the second public meeting to issue its decision. The District denied the charter school proposal by resolution. District 227 submitted a report to the ISBE delineating the proposal's deficiencies. According to its written report, District 227 denied the proposal for three reasons: (1) its "devastating financial impact," (2) "the complete lack of an appropriate plan for special education needs," and (3) "impermissible admissions criteria."

¶ 24    To support its overriding reason to reject the proposal, District 227 asserted that approving the proposal at 1,000 students at 125% per capita tuition would result in a net loss to District 227 of approximately $35 million over the four years, even when a reduction of 40 teachers was considered (1 for every 25 students that would matriculate at the charter school, each at a salary of $70,000 per year). The report asserted that establishing the charter high school would be "ruinous to District 227, virtually depleting all of its operating fund balances in [a] few short years." District 227 noted that no transition impact aid was available from the state for 2010 and 2011. District 227 claimed that at a reduced 100% per capita tuition rate, the financial soundness of the charter school was questionable. District 227 claimed the charter school "would spiral deeper in debt each year until it would have to close or seek a bailout from the State." District 227 also asserted the proposal failed to satisfy other requirements of the Charter Schools Law, including (1) serving at-risk students, (2) demonstrating a broad level of support across District 227's feeder districts and municipalities, (3) a description of pupil performance standards, (4) adequate identification of the location of the charter school, (5) addressing the transportation needs of charter school pupils, and (6) a plan to address minor violations of the charter contract.

¶ 25                            ISBE Proceedings

¶ 26    On March 5, 2010, Southland appealed District 227's denial of the charter school proposal to the ISBE and requested an opportunity to make an oral presentation to the ISBE's staff. Southland submitted its original proposal, along with documents previously not presented to District 227, which included letters in support of the charter school from municipal leaders including the village presidents of Olympia Fields, Richton Park, and Matteson, and the mayor of Park Forest. Southland also submitted a letter from the local state representative supporting the charter school proposal.

¶ 27    In correspondence dated March 17, 2010, District 227 objected to the ISBE considering material not submitted to District 227 with the original charter school proposal. District 227 claimed, "if the charter group wishes to present new information, it should do so in a new proposal to the District 227 Board rather than for the first time in an appeal to the State Board." District 227 offered no authority for its contention that the ISBE should not consider this "new information" from Southland.

¶ 28    On April 30, 2010, the ISBE sent correspondence to Southland, with a copy to District 227, memorializing a meeting on April 29, 2010, between the ISBE staff and members of Southland's development team. According to the correspondence, the ISBE staff had reviewed the charter school proposal, District 227's report detailing the denial of the

proposal, and Southland's appeal documents "to obtain clarification of information contained in the proposal." Citing section 650.60 of title 23 of the Administrative Code, the ISBE correspondence listed issues that needed to be addressed "in order to ascertain whether or not the proposal is in compliance with the provisions of the Charter Schools Law and its implementing regulations and to determine whether or not the charter proposal is in the best interests of the students it is designed to serve."

¶ 29    The ISBE sought additional documentation regarding the goals, objectives, pupil performance standards, and Southland's possible outside funding, including from the federal government. The ISBE explained, "[I]t is not clear whether or not the 'terms of the charter as proposed are economically sound for both the charter school and the school district.' " The ISBE noted the proposed budget for the charter school "displays large excesses of revenues over expenditures: $1 million in year two of operation, $2.7 million in year three, and $4.5 million for several years thereafter." The ISBE expressed concern that the charter, "on the one hand, request[s] 125% of the per capita tuition and, on the other, display[s] such excesses." The ISBE directed Southland to submit documentation showing that the terms of the proposal were economically sound for both Southland and District 227.

¶ 30    On May 7, 2010, Southland submitted documentation addressing each of the issues raised by the ISBE. Southland submitted a revised financial model, seeking funding at 100% of the per capita tuition charge for District 227 students. According to Southland, the modification "reflects a change to which Southland would have agreed if requested by District 227, but District 227 did not engage in any dialogue with Southland before rejecting the Proposal for the creation of the Southland High School." Southland insisted "the financial documents reflecting the change to funding at the level of 100% of the per capita tuition charge demonstrate that Southland's projected revenues will support the operation of the Southland Charter High School, despite the reduction from the prior funding level of 125% of the per capita tuition charge." Southland asserted District 227 would realize significant cost savings from the anticipated migration of 1,000 students to the charter high school. According to the revised proposal, District 227 would realize a cost savings of $14,560,950, based on an operating expense per District 227 pupil of $14,560.95.

¶ 31    The ISBE sent a copy of Southland's filings of May 7, 2010, to District 227. No response from District 227 to Southland's filings appears in the record. The record reflects additional communications between the ISBE staff and Southland that addressed other portions of the proposal.

¶ 32    On May 18, 2010, Dr. Christopher Koch, the ISBE superintendent, issued a recommendation to reverse District 227's denial of Southland's proposal. Dr. Koch recommended that a charter high school be established with 500 students at 100% per capita funding for five years, subject to Southland resolving certain concerns over the terms of the charter agreement. As to the financial feasibility of a proposal for a smaller charter school, Dr. Koch explained:

    "Given a 500 student enrollment cap, the State Superintendent and ISBE staff believe that the proposal leaves the charter school and the District financially secure and solvent and able to withstand the charter's establishment:

-7-

• The District maintains positive fund balances in its major operating funds and, according to its FY10 budget, the District will have a combined fund balance in the major operating funds of $26.5 million and a working cash balance of $3.3 million as of June 30, 2010;

• No short term debt has been issued by the District;

• The District's large fund balance provides a buffer for the District; and,

• Once students migrate, the District will adjust its staffing and expenditure levels to reflect the reduced number of students it serves in order to mitigate the financial impact of a decrease in the number of students."

¶ 33    Dr. Koch noted that neither he nor the ISBE staff "mean to minimize the financial impact the charter school would have on the District; however, such impact is *** unavoidable under the Charter School[s] Law funding scheme." According to Dr. Koch, the financial impact in this case was an insufficient reason for the ISBE to reject the appeal. Dr. Koch concluded that based on the additional information submitted by Southland, the suggested proposal complied with the Charter Schools Law and was in the best interests of the students it was designed to serve.

¶ 34    Following Dr. Koch's recommendation, Southland submitted a revised proposal to the ISBE, reflecting an enrollment of 500 students at 100% per capita funding. The proposal asserted the smaller student body was financially feasible for the charter school. Southland referenced District 227's "strong fund balances" to demonstrate that the revised proposal was economically sound for District 227 as well. The proposal contended a "finalized budget reflecting the change in enrollment will be developed in collaboration and consultation with ISBE staff." It asserted, "Long term benefits will accrue to the communities and the District if property values increase and the tax base increases and more students stay in the district."

¶ 35    On May 21, 2010, the ISBE heard oral argument from the parties. Each side was given 45 minutes for its presentation, followed by a question and answer session from the ISBE board members and the public.

¶ 36    During Southland's presentation, Dr. Blondean Davis, its superintendent, explained that District 227 "is demographically comprised of children who are considered to be at risk[,] coming from a minority population," with a 70% poverty rate as identified by participation in the federal free and reduced lunch program. Southland presented details of its curriculum, its approach to learning, the special education services it would provide, and technological and financing issues.

¶ 37    Donald Theobald, a Southland financial consultant, stated that Southland completed a preliminary analysis of the projected revenues and expenditures for the proposed 500-student charter high school. According to this analysis, the projected revenues and expenditures reflected a positive surplus for the five-year charter period recommended by Dr. Koch.

¶ 38    A second financial consultant on behalf of Southland, James Tapscott, noted that District 227 has "a strong fund balance of about 6-and-a-half months." In Tapscott's opinion, the gradual reduction of students at District 227 over a four-year period "gives the district adequate time to phase in any changes that they need to make in their staffing and other levels."

¶ 39   Dr. Davis then answered questions from the ISBE concerning representation on Southland's board from school districts other than District 162, lottery admission, transportation, educational materials, parental and community involvement, potential building sites, and the student-teacher ratio. Dr. Davis also stated that Southland would "have to be extremely aggressive in bringing funds into the school," and referenced a private foundation that expressed an interest in providing financial assistance.

¶ 40   In its presentation, District 227 asserted the meetings between the ISBE staff and Southland to develop the entirely new charter school proposal violated the ISBE review procedure by cutting District 227 out of the process. District 227 characterized the process as arbitrary because it permitted various changes to be made to the proposal until the ISBE staff could give a conditional recommendation. District 227 acknowledged the ISBE "certainly has the authority under your own rules to request additional information from the charter school." Nevertheless, District 227 averred that the rules of the Administrative Code were violated by the face-to-face meeting between Southland and the ISBE staff on April 29, 2010, which it labeled an *ex parte* communication. District 227 argued that once the ISBE determined it could not accept Southland's initial proposal, Southland should have been directed to submit any revised proposal first to District 227.

¶ 41   Ilandus Hampton, assistant superintendent for finance and operation, spoke on behalf of District 227. Hampton stated District 227's budget is approximately $70 million for 4,100 students. Hampton noted that, although District 227's budget had increased significantly since 2005, District 227 balanced its budget by accessing its surpluses. According to Hampton, the presence of a strong fund balance reflects that District 227 has been "fiscally responsible as it relates to [the community's] tax dollars in relation to the state dollars." The fund balance was created by "great financial planning" and sound decisions. Hampton expressed concern about the recommendation to draw down District 227's fund balance to support the proposed charter high school. Hampton elaborated:

> "When we look at our economy and we look at what's occurring within our state and across the country, unemployment is very high. No jobs, foreclosures, increased risk and trying to reduce numbers as a result of this. So our district itself must make adjustments. That's the purpose of a fund balance. Not for a charter school. It's to serve all students."

¶ 42   Hampton asserted the $13 billion deficit facing the State of Illinois would negatively impact the funding of District 227 by an estimated $2.5 million. He stated that even without the creation of a charter high school, the fund balance would decrease in the upcoming year by $3.5 million. According to Hampton, the establishment of the charter school would speed up the erosion of the fund balance. Hampton concluded that in the face of fiscal responsibility by District 227, "Why would [the ISBE] be financially irresponsible to us?"

¶ 43   Rob Grossi, the chief executive officer of the Hazelcrest School Finance Authority, also testified on behalf of District 227. Grossi had served as a financial advisor and treasurer for several school districts for more than 24 years. He previously served as the treasurer for two charter schools in the city of Chicago. Grounded on this experience, Grossi stated his position without equivocation: "I'm 100-percent confident in the following statement I'm about to make. The impact of a decision of this board to allow the creat[ion] of Southland

School will result in certain academic and financial bankruptcy to Rich Township High School District 227 under both a scenario of a 500-student charter school where the district will pay over $7 million annually, and a 1,000-student charter school where the district will pay over $14 million annually."

¶ 44   Grossi characterized the methodology used by Southland to conclude the charter high school would not adversely impact District 227 as "intellectually lazy." The flaw in Southland's proposal, according to Grossi, was that it assumed that all expenses in a school district were variable. Grossi gave an example of the District's fixed expenses: "[O]ver $2.6 million or $700 of the operating expense per pupil is due to interest on the district's debt. Under the formula proposed by Southland, if Southland took 1,000 students from District 227, Southland would receive more than $700,000 annually from District 227 solely due to the interest component." Southland incorrectly assumed District 227 would save the $700,000 in interest expense when "the expense won't be reduced one penny." According to Grossi, the interest expense alone "would cost Rich High School $7 million over the ten years of their initial proposal."

¶ 45   Grossi also disputed Southland's claim that District 227 would experience a reduction in operating costs from educating fewer students.

"For example, let's assume that Rich High School–the district lost 120 students but they represented 40 students in each of [the district's] three buildings. And within those 40 students there are 10 freshmen, 10 sophomore, 10 junior, 10 senior students. The district would likely not be able to reduce staff much, but they would lose over $1.7 million a year to Southland.

Other expenses also can't be reduced proportionally with student reductions. There may be some savings with transportation, but it'll still cost the same whether a bus is 100-percent full or 80-percent full. The district will still need a superintendent, a business manager, utility expenses will remain unchanged, the cost of cleaning will not be reduced proportionally."

¶ 46   Grossi predicted a financial crisis even with the "ISBE's recommending that the charter only take 500 students and $7.2 million annually. ISBE's hope is that the district will be able to use its existing fund balance to cover the structural deficit. Unfortunately, the expected impact of the state's own crisis and the impact of the charter school will dissolve the funds well before the five-year period." Invoking the exhibit that Dr. Koch used to explain his recommendation that the charter school's total enrollment be reduced to 500 students because the loss of the per capita tuition of 1,000 students would bankrupt District 227 in two years, Grossi stated that based on the same methodology, the proposed 500-student charter high school would bankrupt the district "in three years." With the establishment of even the smaller charter school, District 227 "will be forced to make expenditure reductions in excess of $8 million a year in order to remain solvent."

¶ 47   Deb Vespa, the ISBE's division administrator for school business services, provided her opinion regarding the economic soundness of Southland's proposal. According to Vespa, District 227's fund balance would allow it to remain solvent through 2013. However, in "2014 [District 227] will have a negative fund balance of about $20 million. And that's the

first year as we go to two deficit fund–or negative fund balances where you could certify a district in financial distress if everything continues on and expenditures carry forward." Vespa conceded that her calculations did not take into account any savings to District 227 based on fewer students at its three high schools with the establishment of the charter high school.

¶ 48    Following a closed session, the ISBE raised additional questions concerning the finances of the proposed charter high school. Dr. Davis stated Southland was committed to raising funds from private donors and to applying for public grants.

¶ 49    Thereafter, the ISBE voted unanimously to grant a high school charter to Southland for a period of five years with an enrollment cap of 500 students, "all contingent on Southland addressing the remaining concerns identified in the state superintendent's written recommendation and expressed by members of the State Board of Education."

¶ 50    On June 10, 2010, the ISBE issued its final written decision, adopting Dr. Koch's recommendation and finding Southland's proposal to establish a charter high school of 500 students was in compliance with the Charter Schools Law and in the best interests of the students it was designed to serve.

¶ 51                                    Appeal to Circuit Court

¶ 52    In its complaint for administrative review filed on June 23, 2010, District 227 alleged the ISBE's decision deprived District 227 of approximately $1.8 million at the start of the 2010-11 school year, an amount compounded with each new class for a total four-year loss to District 227 of $18 million. District 227 also challenged the approval of an entirely new proposal by Southland negotiated with the ISBE without permitting District 227 to consider the proposal independently. District 227 alleged this violated the Charter Schools Law and the administrative rules governing the ISBE. District 227 asserted three reasons the approved proposal did not comply with the Charter Schools Law: (1) "[it] clearly fail[ed] to demonstrate that the charter school would be financially sound for both the District and [Southland]"; (2) "[it] fail[ed] to include specific information regarding the charter school's pupil performance standards, a timeline for achievement of those standards, and the procedures the charter school would use to take corrective action if pupil performance did not meet those standards"; and (3) "[it] contain[ed] impermissible public school admissions criteria." In addition, District 227 averred Southland's revised proposal was "not in the best interests of the students that it was designed to serve." District 227 also filed a motion with the circuit court to stay enforcement of the ISBE's decision pending resolution of its complaint for administrative review.

¶ 53    The circuit court first addressed the motion to stay enforcement of the grant of the charter school. The court noted Dr. Koch's recommendation "that given a 500 student enrollment cap, the State Superintendent and the Illinois Board of Education staff believe that the proposal leaves the charter school and the District financially secure and solvent and able to withstand the charter's establishment." The court also noted that District 227 had no short-term debt. The court took note of the highly deferential review of the ISBE's decision. The court observed that in each of the two cases relied upon by the parties, the ISBE's decision

-11-

was upheld. The court concluded: "It appears that public policy calls for this [charter] school to move forward if the requirements of [the Charter Schools Law] are met." As to the issue of whether an immediate stay was required to preserve the status quo without endangering the public, the court found that if the 125 students currently attending Southland were not allowed to continue their studies, this "would be an irreparable harm." The court rejected District 227's suggestion that it would suffer irreparable harm if enforcement of the ISBE order was not stayed. The court concluded, "The concerns that we have heard today about financial insolvency in three years are overblown in the context of this stay motion."

¶ 54    District 227 filed a notice of interlocutory appeal to challenge the denial of its motion to stay. It filed an emergency motion to stay the decision of the ISBE in this court pending appeal, which we denied. District 227 then dismissed its interlocutory appeal.

¶ 55    On December 6, 2010, the circuit court heard oral argument on District 227's complaint for administrative review. District 227 asserted it was undisputed that it was facing insolvency within three years of the establishment of the charter school. It was also undisputed that it would not receive any transition impact aid from the state. District 227 averred that the charter school, as approved, "still fails to meet all 15 of the requirements set forth in the [Charter Schools Law]." Southland responded that its proposal satisfied each of the requirements of the Charter Schools Law. Southland asserted the ISBE considered the totality of all the circumstances surrounding the finances of District 227 and the proposed charter school regarding the revised proposal that capped student enrollment at 500 and provided per capita tuition at 100%. Southland insisted the ISBE's decision took into consideration all of the documentary evidence and testimony that was presented and heard during the public meetings.

¶ 56    On December 13, 2010, the circuit court confirmed the ISBE's decision. "The record contains evidence to support ISBE's determination that the proposal will leave the charter school and District 227 financially secure and solvent, as well as evidence regarding the proposal's compliance with the additional requirements set forth in section 27A-7(a) of the Charter Schools Law." District 227 timely appeals.

¶ 57                                ANALYSIS

¶ 58    District 227 asserts the ISBE's decision to reverse the district's findings and approve Southland's proposal was clearly erroneous because the proposal did not meet three of the statutory elements in section 27A-7(a) of the Charter Schools Law: (1) the terms were not economically sound for both District 227 and the charter school; (2) insufficient information was provided regarding the charter school's goals, objectives, and pupil performance standards; and (3) Southland's mandatory contract constituted an impermissible admissions standard that discouraged enrollment by those parents and students unwilling or unable to meet the contract's terms. According to District 227, because the proposal was deficient, it necessarily followed that no best interests determination of the charter school's intended students could be made. District 227 also directly challenges the "best interests" determination on the claim that the charter school benefits only students from District 162, not all the students in District 227. In the alternative, assuming that the proposal complied

-12-

with the Charter Schools Law and was in the best interests of its students, District 227 argues its due process rights were violated because the ISBE failed to follow the procedures in the Administrative Code that govern the ISBE's review of a local school board's rejection of a charter school proposal. District 227 asserts the review process followed by the ISBE below constituted a constitutional due process violation.

¶ 59    The defendants dispute that whether the three statutory requirements were met is subject to review under a clearly erroneous standard. They contend the ISBE's determination as to each of three disputed requirements was grounded on findings of fact, which are subject to reversal only if they are against the manifest weight of the evidence. The defendants assert that the ISBE's decision that the charter high school would serve the best interests of the intended students is owed substantial deference. They also assert the Illinois Administrative Code was followed during the appeal process to the ISBE. They contend that District 227's constitutional due process claim is undeveloped, rendering it forfeited.

¶ 60    The Administrative Review Law governs our review of the ISBE's decision. 105 ILCS 5/27A-9(e) (West 2010). "The scope of our review [under the Administrative Review Law] extends to all questions of law and fact presented by the record." *Village of Broadview v. Illinois Labor Relations Board*, 402 Ill. App. 3d 503, 505 (2010). "The applicable standard of review depends upon whether the question presented is one of fact, one of law, or a mixed question of fact and law." *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, State Panel*, 216 Ill. 2d 569, 577 (2005).

¶ 61    An agency's findings of fact are "held to be *prima facie* true and correct." 735 ILCS 5/3-110 (West 2008). Such findings "will be disturbed on review only if they are against the manifest weight of the evidence." *Village of Broadview*, 402 Ill. App. 3d at 505 (citing *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204 (1998)). The agency's findings of fact are against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008).

¶ 62    An agency's conclusions of law are reviewed *de novo*. *Cinkus*, 228 Ill. 2d at 210-11. "A reviewing court is not bound by an agency's interpretation of a statute [citation], but the agency's interpretation remains relevant where there is a reasonable debate about the meaning of the statute [citation]." *Comprehensive Community Solutions*, 216 Ill. 2d at 471.

¶ 63    Mixed questions of law and fact are subject to review for clear error. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 392 (2001). "Such review is significantly deferential to an agency's experience in construing and applying the statutes that it administers." *Comprehensive Community Solutions*, 216 Ill. 2d at 472 (citing *AFM Messenger*, 198 Ill. 2d at 393-94). A mixed question of law and fact typically arises when "the historical facts are not in dispute and the issue is whether the established facts satisfy the statutory standard." *Village of Hazel Crest v. Illinois Labor Relations Board*, 385 Ill. App. 3d 109, 113 (2008). An agency's decision is clearly erroneous "only where the reviewing court, on the entire record, is 'left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger*, 198 Ill. 2d at 395 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

-13-

¶ 64    We first address District 227's contention that the eventual proposal from Southland, as recommended by Dr. Koch and approved by the ISBE, failed to meet three statutory requirements: economic soundness; clear standards on goals, objectives, and pupil performance; and a proper admissions standard. See *Comprehensive Community Solutions*, 216 Ill. 2d at 473 ("the State Board must determine *** whether the proposal was in compliance with the Charter Schools Law, including the requirements listed in section 27A-7"). We set out the applicable standard of review in our discussion of each of the statutory requirements.

¶ 65                                    Economic Soundness

¶ 66    District 227 asserts the evidence it marshaled demonstrated that the establishment of the charter school would result in District 227's insolvency within the five-year period granted to the charter school. District 227 contends its projected insolvency precludes a finding of economic soundness. District 227 points to the testimony of Grossi and Vespa, and the lack of transition impact aid from the state to support its contention. District 227 argues the ISBE was myopic in its reliance on the district's current sound financial state and failed to give adequate consideration to the dire financial effects of establishing a charter high school. District 227 cites *Comprehensive Community Solutions* for the analysis that must be followed when economic soundness is challenged.

¶ 67    In *Comprehensive Community Solutions*, our supreme court observed the legislative intent of the "economic soundness" requirement in section 27A-7(a)(9) necessarily extends to evidence of the school district's finances. *Id.* at 477. In that case, the charter school proposal was a five-year plan to serve 75 students at its inception and ultimately 120 students. The charter school was designed to help "at-risk and out-of-school students make the transition from 'street to school' and 'street to work' with educational, vocational, and social support." *Id.* at 461. The charter school proposed a 100% per capita student expenditure for its budget, while the local school board would continue to provide special education services to charter school students " 'on the same basis it does for Rockford School District students.' " *Id*. at 462.

¶ 68    During its initial review, the local school board expressed concern that because of the school district's cash flow problems, it would need to borrow money to approve the proposal. *Id.* The charter school conditionally proposed a variable funding rate starting at 88% in the first year and topping off at 95% in the fifth year of the charter, but only if the proposal were otherwise accepted. If not, charter school would stand on its "original proposal." *Id.* at 463.

¶ 69    Following two public meetings, a committee of the local school board recommended that a proposal at 75% per capita funding be approved, which the board rejected by an evenly split vote. *Id.* The local school board explained in its report to the ISBE the principal reason it denied the original proposal seeking a 100% per capita funding rate. " 'Rockford School District would sustain a loss of $30,717.00 which would not include the cost of special education services for which it would be responsible. Given the dire financial situation, the Rockford School District cannot take on more debt.' " *Id*. at 464. At a hearing before the ISBE, the district asserted that even with a variable funding rate, " 'the board would still

encounter a $483,234 deficit.' " *Id.*

¶ 70    In its recommendation to the State Superintendent of Education, the ISBE appeal panel found the proposal complied with the Charter Schools Law and would be in the best interests of the intended students. *Id.* at 465. The appeal panel determined that the five-year net deficit created by the charter school would range from $2.57 million at a funding a rate of 100% per capita to $1.87 million at 80% per capita. *Id.* The ISBE appeal panel asserted it did not "minimize the impact of any potential loss of revenue from Rockford's educational fund. However, a revenue loss to the district is inescapable under the Charter Schools Law, but is necessary to serve the law's goal 'to provide parents and pupils with expanded choices within the public school system.' " (Internal quotation marks omitted.) *Id*. at 465. The appeal panel concluded that the ISBE should reverse the district's decision and grant the charter. *Id.* at 466. The State Superintendent agreed with the panel's conclusion and forwarded this recommendation to the ISBE. *Id.*

¶ 71    During its review process, the ISBE requested additional information from both the charter school and the district in accordance with the Administrative Code. 23 Ill. Adm. Code 650.60(b) (2011); *Comprehensive Community Solutions*, 210 Ill. 2d at 466. The ISBE asked the district to identify the specific hardships should the charter be approved. *Id.* The district responded that it would incur a five-year deficit of $30,717 at a 75% per capita funding rate, a deficit of $483,234 at a 88% to 95% variable rate, and a deficit of $676,639 at a 100% rate. *Id.* The district also pointed to its existing deficit of $32.65 million, which according to an independent audit, cast " 'substantial doubt about the District's ability to continue as an ongoing concern.' " *Id.*

¶ 72    Following a special meeting on the economic impact on the local school district, the ISBE directed the parties to provide still additional information. *Id.* at 467. The charter school indicated it anticipated additional funding from federal grants. *Id.* The district responded it recently approved budget cuts of $12.2 million, it had an outstanding obligation to repay $55 million in tax anticipation warrants, with an additional $31 million in tax objections that it needed to address. *Id.* The district asserted it could not assume any new debt. *Id.*

¶ 73    Ultimately, the ISBE upheld the local school board's decision to deny the charter school proposal. *Id.* The ISBE explained its rejection of the charter school's appeal: " '[T]he proposed charter school is not economically sound for Rockford School District 205 in view of the very serious financial problems that currently exist in the district.' " *Id*. at 468. The circuit court confirmed the decision of the ISBE and the charter school appealed. *Id.* at 469.

¶ 74    The appellate court upheld the ISBE's decision. *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 351 Ill. App. 3d 1109 (2004). Applying a clearly erroneous standard, the appellate court concluded the ISBE's finding, that the proposal was not economically sound for both the local school district and the charter school, did not leave it with a definite and firm conviction that the ISBE had made a mistake.

¶ 75    Before the supreme court, the charter school did not dispute the financial condition of the local school district or the deficits calculated to result from the establishment of a charter school. *Comprehensive Community Solutions*, 216 Ill. 2d at 477-78. The supreme court

observed the establishment of a charter school "should not imperil the entire school district." *Id*. at 480-81. The Charter Schools Law "was not intended to drive fiscally challenged districts out of business." *Id*. at 481. The supreme court explained the economic soundness requirement of the Charter Schools Law:

" 'Economic soundness' in section 27A-7(a)(9) is not a bright-line standard, but rather a continuum. The terms of some charter school proposals will be more economically sound for a school district than other proposals, depending upon their effects on the district's bottom line. We do not hold that any school district experiencing a budget deficit may deny a charter school proposal with impunity. We simply hold that, under the facts presented here, the State Board's decision that [the charter school's] proposal was not in compliance with the Charter Schools Law or in the best interests of the district's students was not clearly erroneous." *Id*.

¶ 76 We first address the standard of review applicable to the economic soundness requirement in the instant appeal. We note that while the supreme court applied a clearly erroneous standard to the ISBE's decision in *Comprehensive Community Solutions*, that standard applied because the charter school did not dispute the financial condition of district or the deficits calculated to result from the establishment of a charter school. *Id.* at 477-78. The historical facts were not disputed, leaving only "whether the established facts satisf[ied] the statutory standard." *Village of Hazel Crest*, 385 Ill. App. 3d at 113. Thus, in *Comprehensive Community Solutions*, the court was presented with a mixed question of law and fact.

¶ 77 In the instant case, however, District 227's principal contention is that its evidence regarding its projected insolvency should have won the day before the ISBE. Thus, central to the ISBE's conclusion on the economic soundness of the proposal is its rejection of District 227's projected budget deficit three years down the road as sufficient to compel the ISBE to affirm District 227's rejection of the Southland proposal. As the supreme court made clear in *Comprehensive Community Solutions*, economic soundness "is not a bright-line standard, but rather a continuum." *Comprehensive Community Solutions*, 216 Ill. 2d at 481. On that continuum, the ISBE concluded that the conflicting evidence regarding District 227's ability to adjust to the financial pressures of establishing a charter high school favored establishing the charter high school. In other words, the revised proposal with a cap of 500 students was economically sound for both District 227 and Southland. The findings of fact underlying the ultimate conclusion reached by the ISBE are set out in the record.

¶ 78 The ISBE adopted Dr. Koch's recommendation to reverse District 227's rejection of the charter school proposal because "the District will adjust its staffing and expenditure levels" with the reduced student population as more students attend Southland. The Superintendent concluded that "the proposal leaves the charter school and the District financially secure and solvent." The Superintendent also noted that no short term debt had been issued by the District. Finally, the Superintendent pointed out that District 227 presented a positive fund balance of $26.5 million and a working cash balance of $3.3 million as of June 2010.

¶ 79 Against the backdrop of these findings, we reject District 227's argument that the clearly erroneous standard applies. See *People v. Crane*, 195 Ill. 2d 42, 51 (2001) (when factual

-16-

determinations are made during the proceedings below, the manifest weight of the evidence standard applies). Nor do we agree with District 227's suggestion that the ISBE was legally compelled to issue a decision based on its evidence alone. The ISBE was required to resolve the conflicts in the evidence in the first instance. We will not engage in the reweighing of the evidence heard and considered by the ISBE as District 227 urges us to do. We review factual findings against the manifest weight of the evidence. *Id.* at 478; *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992).

¶ 80       We also reject District 227's suggestion that its financial position is similar to the financial position of the school district in *Comprehensive Community Solutions* as District 227's evidence is not as powerful as it claims. A review of the record shows that much of the evidence presented by District 227 was based on Southland's initial proposal of 1,000 students at a 125% per capita rate, which District 227 used to claim dire financial circumstances. Similar financial figures were never presented based on the revised 500-student, 100% per capita charter school proposal ultimately approved by the ISBE. Rather, District 227 simply extrapolated from the data regarding the original proposal to forecast a similar outcome, just at a slightly slower pace.

¶ 81       District 227 provided little evidence, other than the strong opinions of its witnesses, to demonstrate that the proposal was not economically sound for both the District and Southland. While Grossi concluded that District 227 would be insolvent within three years if the proposed 500-student, 100% per capita charter school were established, he did so in summary fashion. Grossi provided no documentary evidence to support the claim of impending insolvency. Grossi also claimed major expenditure reductions to District 227 programs would be required if the proposal was approved, but no evidence was ever submitted to document this claim.

¶ 82       Vespa's conclusions calling into question the economic soundness of the proposal were equally challenged. In fact, Vespa conceded that her calculations did not take into account possible savings to District 227 that might accrue from a reduced student enrollment.

¶ 83       Finally, District 227 asserts that lack of transition impact aid from the state should doom the charter school proposal. But the ISBE's decision did not rely on possible state transition impact aid; its decision was based on the strong finances of District 227, which it concluded could "withstand the charter's establishment."

¶ 84       We note that the record contains no evidence of the impact on District 227's budget over the five-year period if a charter school with 500 students at a 100% per capita funding rate were established. Unlike in *Comprehensive Community Solutions*, no independent audit was presented to support District 227's prediction of dire financial circumstances during the course of the five-year charter grant. Our supreme court cautioned against accepting facile challenges based on economic soundness. "To allow a local school board to deny a charter proposal because it may have an adverse financial impact on the district's budget would defeat the purpose of the statute, which is to create choice and thus competition." *Comprehensive Community Solutions*, 216 Ill. 2d at 475.

¶ 85       While the parties do not dispute that the Southland proposal creates an adverse financial impact on District 227's budget, both currently and over the course of the five-year charter

period, Southland and the ISBE dispute District 227's claim of insolvency on which this appeal is grounded. Contrary to District 227's claim, the manifest weight of the evidence presented to the ISBE, however, does not show that reallocation of funding for the establishment of the charter school and its continued existence over a five-year period would financially imperil the entire school district.

¶ 86 Based on the record before us, we cannot say the ISBE's findings of fact underpinning its decision that Southland's proposal complied with the economic soundness requirement of section 27A-7(a)(9) were against the manifest weight of the evidence. Even if our review of the economic soundness of the proposal is subject to the clearly erroneous standard, the ISBE decision passes under that standard as well. We are not left with the definite and firm conviction that the ISBE made a mistake in concluding the establishment of the charter school was economically sound for both Southland and District 227.

¶ 87 Goals, Objectives, and Pupil Performance Standards

¶ 88 District 227 next contends Southland's proposal did not adequately set forth the "goals, objectives, and pupil performance standards to be achieved." 105 ILCS 5/27A-7(a)(5) (West 2008). District 227 insists that after the ISBE requested additional information from Southland regarding its goals, objectives, and pupil performance standards, Southland merely copied and pasted the same deficient information it previously submitted onto its revised proposal.

¶ 89 In the initial proposal, Southland asserted its goals, objectives, and pupil performance standards were meant to ensure its students graduated from high school and were prepared to attend college. The proposal broadly stated, "We recognize that Southland College Prep Charter High School is a school of choice, and we promise to meet the needs of each student. We are committed to excellence in education for all students and, therefore, have very high expectations that are clearly defined and measurable." The proposal listed 18 goals and provided short descriptions of the charter school's educational program and pupil performance standards, which Dr. Koch found were "vague and not stated in measurable terms."

¶ 90 At the direction of the ISBE staff, Southland submitted amendments to its goals, objectives, and pupil performance standards, followed by a detailed discussion of each. Upon review of the amendments, Dr. Koch stated in his recommendation that the proposal "now provides sufficient information regarding the goals, objectives and pupil performance standards it expects to achieve. The standards included in the proposal are stated in measurable terms, with specific benchmarks."

¶ 91 The ISBE, in adopting Dr. Koch's assessment that the "standards *** are stated in measurable terms," made a finding of fact, which is subject to reversal only if it is against the manifest weight of the evidence. *Abrahamson*, 153 Ill. 2d at 88. District 227's argument that the goals, objectives, and pupil performance standards in the original proposal, which were found to be deficient, were recycled in the revised proposal is rebutted by the record.

¶ 92 The ISBE found that Southland's amended goals, objectives, and pupil performance standards in its revised proposal satisfied section 27A-7(a)(5). District 227 does not provide

us with any substantive reason or cite any authority to compel a reversal of that finding. Whether that ruling is a finding of fact, subject to review under the manifest weight of the evidence standard, or is a mixed question of law and fact, subject to review for clear error, District 227 fails to persuade us that the ISBE erred.

¶ 93                               Admissions Standard

¶ 94     As its last contention that Southland's proposal failed to satisfy a requirement of the Charter Schools Law, District 227 asserts the proposal contains admissions criteria that would be impermissible "if used by a school district." 105 ILCS 5/27A-7(a)(2) (West 2008). District 227 quotes from the original proposal: "Each family at Southland must sign a contract with Southland College Prep Charter High School setting forth the parents' and students' commitment to work with Southland College Prep Charter High School to achieve maximum student outcome." District 227 notes additional language in the contract requiring students to wear proper uniforms daily and to work to beautify the school, garden, and surrounding areas. District 227 asserts the contractual language serves as a mechanism to screen out students. In support, District 227 quotes from a 2002 ISBE press release that explained its denial of a proposed charter school in Champaign, Illinois, which we repeat here:

> "Since the law requires charter schools to be open to any pupil who resides in the geographic boundaries, such a covenant may not be used as a mechanism to screen out students."

¶ 95     We find District 227's contention that Southland's proposed contract for students and their parents that are *admitted* to the charter high school constitutes a mechanism to *screen out* students, raises a question of fact subject to the manifest weight of the evidence standard of review. *Abrahamson*, 153 Ill. 2d at 88. The evidence on this requirement is clearly and unequivocally contrary to District 227's claim. The proposal states that enrollment "shall be open to any pupil who resides within the boundaries of District 227." In the event there are more eligible applicants for enrollment than available spaces, "successful applicants will be selected by lottery which shall be open to all applicants and the public." The record evidence fails to provide any support that the contract between Southland and its admitted students and their parents is a mechanism to screen out students. Nor does the ISBE 2002 press release regarding a Champaign charter school have any relevance to the instant case.

¶ 96     We reject out of hand District 227's argument that the Southland Charter contract constitutes an improper screening device. Nothing in the record supports this claim; District 227's contention is without merit regardless of the applicable standard of review, including the standard most favorable to District 227–*de novo* review.

¶ 97                                 Best Interests

¶ 98     District 227 argues that even if Southland's proposal complies with the statutory factors set forth in section 27A-7(a), the ISBE's approval was clearly erroneous because the proposal was not designed to serve the best interests of *all students of District 227*. District 227 notes that each of its three high schools tops the ISBE's African-American and low income student

progress rankings, which, it asserts, demonstrates that District 227 is making progress to maximize student outcomes and increase learning opportunities for all its students, with special emphasis on expanded learning experiences for at-risk pupils. Without elaborating on its implications, District 227 claims that from its inception, Southland's proposal was meant to serve only the interests of District 162 students.

¶ 99    Initially, Southland and the ISBE respond that this claim was never raised before the circuit court and therefore District 227 has forfeited this argument, citing *Vine Street Clinic v. Healthlink, Inc.*, 222 Ill. 2d 276, 301 (2006). The ISBE points out that District 227 summarily contended in its initial memorandum of law filed with the circuit court that the amended proposal was not in the best interests of the *students it was designed to serve*. The ISBE asserts that District 227 never developed the "best interests" argument asserted below even after Southland challenged the adequacy of this claim in its written response. Both the ISBE and Southland contend that District 227's argument that the charter school proposal had to serve the best interests of all students of District 227 to win approval was never raised below and is therefore forfeited. Though this forfeiture claim is supported by the record, we elect to address the argument of District 227 on its merits.

¶ 100    The best interests factor, as one of two overall conditions that must be met under the Charter Schools Law, involves a mixed question of law and fact subject to review for clear error. *Comprehensive Community Solutions*, 216 Ill. 2d at 472. Our review is significantly deferential to the ISBE's experience in construing and applying the statute it administers. *Id*.

¶ 101    The record shows that in the course of discussing the best interests factor, Dr. Koch compared the students in District 162 to the students in the high schools in District 227 in various categories to assess the prospects for education achievement of prospective students at the charter high school. "District 162 has successfully raised the meets/exceeds percentages of its students' overall Illinois State Achievement Test (ISAT) scores from 62.4% in 2003-2004 to 81.4% for both years 2007-2008 and 2008-2009. Meanwhile, [District 227's] scores on the Prairie State Achievement Examination (PSAE) for the same period remain[ed] consistently low." Dr. Koch noted that the performance gap between District 162 and District 227 was "undeniable." District 227's PSAE scores placed its schools in the bottom 10% of high school districts in 2008 and in 2009. Dr. Koch's approval recommendation also noted that District 162 had done a much better job in dealing with the student truancy rate. "District 162's truancy rate ranked it as 293 out of 378 elementary school districts in 2008 and 288 out of 378 elementary school districts in 2009; whereas District 227 ranked 13 out of 100 high school districts in 2008 and 16 out of 100 high school districts in 2009." Dr. Koch concluded that District 162 "gets its students to class" and expressed confidence that as the operator of Southland, it would do the same for students from District 227. According to Dr. Koch, "Given that District 227 is a relatively low performing district, it appears that it would be in the best interest of the students to give them another viable high school option."

¶ 102    The Charter Schools Law is meant to provide a means to improve educational opportunities for public school students. "There are educators, community members, and parents in Illinois who can offer flexible and innovative educational techniques and programs, but who lack an avenue through which to provide them within the public school

system." 105 ILCS 5/27A-2(a)(2) (West 2008). The Charter Schools Law should be liberally interpreted "to support the findings and goals of this Section and to advance a renewed commitment by the State of Illinois to the mission, goals, and diversity of public education." 105 ILCS 5/27A-2(c) (West 2008).

¶ 103    We are left with no doubt that the establishment of the charter high school is in the best interests of the students it was designed to serve and, eventually, its establishment may well serve the best interests of all District 227 students to the extent the academic success of the charter school raises the educational bar for the other three high schools. *Comprehensive Community Solutions*, 216 Ill. 2d at 475 (a purpose of the Charter Schools Law "is to create choice and thus competition"). Nothing in the record supports District 227's contention that the establishment of the charter school is contrary to the best interests of all the students in District 227.

¶ 104    Based on the record before us, the ISBE's conclusion that the establishment of the charter high school served the best interests of the students it was designed to serve and hence all students in District 227 is not clearly erroneous.

¶ 105                                                    Due Process

¶ 106    In a final effort to reverse the ISBE decision, District 227 contends that even assuming *arguendo* the proposal complied with the Charter Schools Law and was in the best interests of the students of District 227, the ISBE violated District 227's due process rights by failing to adhere to the appeal procedures in the Administrative Code. District 227 avers that when Southland appealed to the ISBE on March 5, 2010, it submitted "a plethora of additional materials that were never presented to District 227" when it rejected the original proposal. District 227 contends that during the course of the meeting between the ISBE staff and members of Southland's development team on April 29, 2010, Southland "was unlawfully given the opportunity to present its appeal to ISBE's staff without anyone from District 227 being notified of their presentation or given a chance to further explain the report which denied [the] original proposal." In effect, District 227 contends a proposal may not be revised in consultation with the ISBE staff, absent direct participation by the local school board. District 227 broadly claims that permitting revisions of a charter school proposal before the ISBE staff alone, wrongly eliminates the local school board and community from the charter approval process altogether.

¶ 107    Southland and the ISBE assert that no violation of the Administrative Code occurred during the proceedings before the ISBE. They contend no constitutional due process violation can occur when the procedures of the Administrative Code were followed because the procedures provide adequate due process safeguards. The ISBE contends District 227 forfeited its purported constitutional claim because no contention is raised apart from the claimed violation of the Administrative Code. Responding to District 227's claim the meeting between Southland and the ISBE on April 29, 2010, constituted an improper *ex parte* communication, the ISBE rejects that characterization, but notes that even if the characterization is accurate, to prevail on its request for reversal, District 227 must demonstrate that it suffered prejudice arising from that communication, which it cannot do.

¶ 108     First, we agree with the ISBE and Southland that the purported constitutional due process claim asserted by District 227 has been forfeited. See *Elder v. Bryant*, 324 Ill. App. 3d 526, 533 (2001). Though couched as a constitutional due process claim, the substance of the claim is entirely based on a purported violation of the Administrative Code. In its brief, District 227 asserts that "a government agency's failure to abide by established administrative regulations may constitute a due process violation," citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265-68 (1954), but neither develops the argument nor explains the relevance of the citation to the facts of this case. This court is not a depository in which the burden of research and argument may be dumped. *Gandy v. Kimbrough*, 406 Ill. App. 3d 867, 875 (2010); *People v. Hood*, 210 Ill. App. 3d 743, 746 (1991) ("A reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not simply a depository into which the appealing party may dump the burden of argument and research.").

¶ 109     Next, as we make clear below, we find nothing improper in the ISBE staff meeting with Southland to assist in revising the charter school proposal. However, even assuming *arguendo* that the meeting on April 29, 2010, constituted an *ex parte* communication, District 227 is still not entitled to any relief. "A court will not reverse an agency's decision because of *ex parte* contacts with members of that agency absent a showing that prejudice to the complaining party resulted from such contacts." *Sangirardi v. Village of Stickney*, 342 Ill. App. 3d 1, 11 (2003). "Where the administrative agency operates in an adjudicatory capacity, bias or prejudice may only be shown if a disinterested observer might conclude that the administrative body, or its members, had in some measure adjudged the facts as well as the law of the case in advance of hearing it." *Id*. at 11-12. The circumstances present in this case involve no such conduct by the ISBE. Nor does District 227 argue that "the facts as well as the law of the case" were adjudged by the ISBE before the public meetings.

¶ 110     Finally, we are unpersuaded by District 227's argument that the appeal procedure of the Administrative Code was not followed here. Once an appeal to the ISBE is initiated, the "parties shall submit to the State Board such additional information as the State Board determines is necessary to decide the appeal." 23 Ill. Adm. Code 650.60(b) (2011). The Charter Schools Law also provides that the ISBE "shall provide technical assistance to persons and groups preparing or revising charter applications." 105 ILCS 5/27A-11(f) (West 2008). There is no authority to support District 227's implicit contention that "technical assistance" is not permitted by direct communication between the ISBE staff and the "persons and groups preparing revised charter applications." *Id*. The language of the section also makes clear that "technical assistance" is meant to be provided in the course of "revising charter applications." *Id*. District 227 acknowledged as much before the ISBE.

¶ 111     At the May 21, 2010, hearing, District 227 agreed that the ISBE was authorized to request additional information. The meeting on April 29, 2010, as memorialized in correspondence sent from the ISBE to District 227 on April 30, 2010, was not outside the authority granted to the ISBE by the Charter Schools Law. The Charter Schools Law "should be interpreted liberally [with the aim of advancing] a renewed commitment by the State of Illinois to the mission, goals, and diversity of public education." 105 ILCS 5/27A-2(c) (West 2008). The ISBE staff properly provided technical assistance to Southland, while providing due notice to District 227 of its efforts. The Charter Schools Law was meant to provide

public meetings to address the merits of a charter school proposal, at which time the local school board may present its view if it disagrees with the proposal.

¶ 112    Nevertheless, District 227 baldly asserts the ISBE should never have ruled upon the revised proposal until it was first considered by District 227. It is telling that District 227 fails to cite any authority for its contention that a revised charter school application had to go before the local school board before the ISBE could consider it. The authority granted the ISBE makes clear that charter applications are subject to revision. 105 ILCS 5/27A-11(f) (West 2008). A mandate that a charter application revised with the assistance of the ISBE must return to the local school board for consideration before the ISBE can rule upon it would be contrary to the clear import of the Charter Schools Law. As counsel for Southland pointed out at oral arguments, the process the ISBE staff engaged in with Southland is consistent with the Charter Schools Law whose aim is to encourage proposals to establish charter schools.

¶ 113    As we noted above, the ISBE staff provided District 227 with details of the communications between the ISBE and Southland to craft an acceptable proposal. Of course, once Southland submitted its revised proposal to the ISBE, District 227 was given every opportunity to challenge the revised proposal. The record contains no written response by District 227 to Southland's amended filings.

¶ 114    To summarize, even assuming *arguendo* that the assistance the ISBE staff provided to Southland to craft a revised proposal constituted an *ex parte* communication, District 227 failed to show it suffered any prejudice from that assistance. However, we expressly find that in the course of the proceedings below, the ISBE did not violate the procedural rules of the Administrative Code by assisting Southland in modifying its original proposal to one that the ISBE ultimately found satisfied all the requirements of the Charter Schools Law and served the best interests of the students it was designed to serve, even though the revised proposal was never submitted to or ruled upon by District 227.

¶ 115                                    CONCLUSION

¶ 116    In accordance with the record evidence, the ISBE acted within its discretion to reverse District 227's denial and grant Southland's proposal to establish a charter high school. We affirm the judgment of the circuit court of Cook County, confirming the decision of the ISBE.

¶ 117    Affirmed.