# Illinois Official Reports

## Appellate Court

---

***Board of Education of Waukegan Community Unit School District 60 v. Illinois State Charter School Comm'n*, 2018 IL App (1st) 162084**

---

| | |
|---|---|
| Appellate Court Caption | THE BOARD OF EDUCATION OF WAUKEGAN COMMUNITY UNIT SCHOOL DISTRICT 60, Plaintiff-Appellant, v. THE ILLINOIS STATE CHARTER SCHOOL COMMISSION, THE ILLINOIS STATE BOARD OF EDUCATION, and THE LAWNDALE EDUCATIONAL AND REGIONAL NETWORK CHARTER SCHOOL, Defendants-Appellees. |
| District & No. | First District, Fourth Division<br>Docket No. 1-16-2084 |
| Filed | January 25, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-CH-8889; the Hon. Anna Helen Demacopoulos, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Patricia J. Whitten, Respicio F. Vazquez, and Nicki B. Bazer, of Franczek Radelet P.C., of Chicago, for appellant.<br><br>Lisa Madigan, Attorney General, of Chicago (David L. Franklin, Solicitor General, and Valerie Quinn, Assistant Attorney General, of counsel), for appellees. |

PRESIDING JUSTICE BURKE delivered the judgment of the court, with opinion.
Justices Gordon and Ellis concurred in the judgment and opinion.


**OPINION**

¶ 1    Defendant, the Lawndale Educational and Regional Network Charter School (LEARN), an operator of several charter schools in the Chicago area, submitted a proposal to plaintiff, the Board of Education of Waukegan Community Unit School District 60 (District 60), to open a charter school in Waukegan. After reviewing the submission, District 60 found several inadequacies with LEARN's proposal and denied the application to open the school. LEARN appealed the denial to defendant, the Illinois State Charter School Commission (Commission), who concluded that LEARN's proposal was in compliance with the requirements of the Charter Schools Law (105 ILCS 5/27A-1 *et seq.* (West 2014)) and in the best interests of the students the school was designed to serve. The Commission accordingly reversed the decision of District 60 and agreed to a charter with LEARN, which was certified by defendant, the Illinois State Board of Education (ISBE), thus establishing the charter school. District 60 subsequently filed a complaint in the circuit court for administrative review and alleged that the Commission committed multiple violations of the Open Meetings Act (5 ILCS 120/1 *et seq.* (West 2014)). The circuit court affirmed the Commission's decision and dismissed the remaining counts of District 60's complaint. Meanwhile, in the fall of 2015 and during the pendency of the circuit court proceedings, LEARN began operating its charter school in Waukegan with approximately 200 students from kindergarten to third grade.

¶ 2    Before this court, District 60 contends that (1) the Commission and ISBE lost jurisdiction over LEARN's appeal and certification when they failed to adhere to the statutory timeline of the Charter Schools Law, (2) the Commission improperly reversed the district's decision to deny LEARN's proposal where the application was deficient in several manners and not in the best interests of the students the school was designed to serve, (3) the Commission violated the district's due process rights, (4) the Commission committed multiple violations of the Open Meetings Act, and (5) the circuit court erred in dismissing the remaining counts of its complaint. For the reasons that follow, we affirm.


¶ 3                                  I. BACKGROUND
¶ 4                              A. The Charter Schools Law
¶ 5    A charter school is a tuition-free public school supported by public funds but operated by a nonprofit entity independent from the school district in which it operates. 105 ILCS 5/27A-5(a), (e) (West 2014); *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455, 458 (2005). In 1996, the Illinois legislature enacted the Charter Schools Law as a means to provide alternative public education models that were innovative and flexible but still maintained high levels of student performance with a particular focus on students who were less likely to succeed in a traditional educational environment because of "physical, emotional, socioeconomic, or cultural factors." 105 ILCS 5/27A-2(a), 27A-2(b), 27A-3 (West 2014). To promote innovation and flexibility, the Charter Schools Law

exempts charter schools from several state laws and regulations that are applicable to traditional schools. *Id.* § 27A-5(g). A charter school operates under a charter, or contract, between the nonprofit entity and the school's authorizer, which may be the local school board or the Commission, depending on who ultimately approves the charter. *Id.* §§ 27A-6(a), 27A-9(f).

¶ 6    Charter schools are open for enrollment "to any pupil who resides within the geographic boundaries of the area served by the local school board." *Id.* § 27A-4(d). If there are more applicants to the school than spaces available, enrollees must be selected by a lottery. *Id.* § 27A-4(h). Because charter schools are supported by public funds and enroll students who otherwise would attend traditional public schools, they take funding away from the local school district. *Id.* §§ 27A-9(f), 27A-11(b). Part of the charter school's funding is based on a percentage of the local school district's per capita tuition charge, at the time of LEARN's proposal between 75% and 125%, multiplied by the amount of students enrolled in the charter school that reside in the local school district.[1] *Id.* § 27A-11(b).

¶ 7    An entity that wants to open a charter school must submit a proposal to the school board in the district where the charter school would be located. *Id.* § 27A-7(a). In order to demonstrate that the proposed charter school would be a suitable educational alternative, the proposal must contain several requirements, including identifying two potential locations for the school; describing the school's educational program, goals, objectives and performance standards; and providing evidence that the terms of the proposed charter are "economically sound" for both the school and the district. *Id.* § 27A-7(a)(3), (5), (7), (9).

¶ 8    Following the submission of the proposal, the local school board must vote to either grant or deny the charter school's application. *Id.* § 27A-8(e). If the board denies the application, the applicant may appeal the denial to the Commission, who subsequently conducts a *de novo* review of the proposal. *Id.* § 27A-8(g); 23 Ill. Adm. Code 650.110(d)(1) (2012). The Commission may reverse the denial if it "finds that the proposal (i) is in compliance with [the Charter Schools Law] and (ii) is in the best interests of the students the charter school is designed to serve." 105 ILCS 5/27A-8(h) (West 2014).

¶ 9    If the Commission reverses the local school board's denial, the Commission itself becomes the charter school's authorizer, meaning it oversees the charter school rather the school board. *Id.* §§ 27A-3, 27A-9(f). Under these circumstances, the charter school also becomes its own local educational agency (*id.* § 27A-5(k)), which under federal law has a specific meaning. See 20 U.S.C. § 7801(26)(A) (2012). As its own local educational agency, the charter school becomes entirely responsible for implementing services required by law that ordinarily would be the responsibility of the local school district, such as implementing procedures to comply with the Individuals with Disabilities Education Act (20 U.S.C. § 1400 *et seq.* (2012)); see 105 ILCS 5/14-1.01 *et seq.* (West 2014). Regardless of who authorizes the charter school, ISBE must certify the application and charter before the school begins to operate. 105 ILCS

---

[1]The per capita tuition charge is essentially a calculation used to quantify the amount of money a school district pays from its own resources for each student enrolled in its schools. Recently, our legislature changed the permissible funding range of charter schools to between 97% and 103% of the local school district's per capita tuition charge. Pub. Act 100-465 (eff. Aug. 31, 2017) (amending 105 ILCS 5/27A-11(b)).

5/27A-6(d), 27A-9(f) (West 2014).

¶ 10                    B. Waukegan Community Unit School District 60

¶ 11        During the 2013-14 school year, District 60 served approximately 16,300 students. Among its students, 77% were Hispanic, 16% were black, and 4% were white. Additionally, 72% of District 60's students were low-income; 29% were English language learners (ELL), generally students whose native language is not English; and 12% had disabilities. In the Illinois Standards Achievement Test (ISAT), 39% of District 60's students met or exceeded the state standards compared to the statewide average of 59%. District 60's graduation rate was 76% compared to the statewide average of 86%, and 18% of its students were "college ready" compared to the statewide average of 46%.

¶ 12                          C. LEARN's Proposal

¶ 13        In 2014, LEARN, a 501(c)(3) nonprofit entity whose first charter school opened in 2001, operated eight charter schools in the Chicago area, including one in North Chicago, and served approximately 3600 elementary and middle school students. LEARN's mission was to provide minority and low-income students "with the academic foundation and ambition to earn a college degree," and to that end, it focused on elementary education where it believed "the ambition and academic foundation for college must be sown and cultivated." Among LEARN's students, 89% were black, 9% were Hispanic, and 89% were low-income. LEARN touted that 95% of its students graduated from high school and attended college.

¶ 14        During the spring of 2014, LEARN conducted a needs assessment of various communities in the Chicago area and identified District 60 as one that could benefit from a LEARN charter school. On November 14, 2014, based on this perceived need, LEARN submitted a proposal to District 60 to open a charter school in Waukegan that would open in September 2015. LEARN envisioned that the Waukegan campus would initially enroll 200 students in kindergarten through third grade and add one grade per year until the school had 600 students enrolled in 2021 and was a fully functioning kindergarten through eighth grade (K-8) school.

¶ 15        In its proposal, LEARN supplied various data that compared the academic performance of its students to District 60's students. In particular, in 2013 ISAT testing, 54% of LEARN's Chicago students met or exceeded the state standards. However, among students who had attended a LEARN school for five or more years, 66% met or exceeded the state standards whereas, among students who had attended a LEARN school for only one year, 39% met or exceeded the state standards. Additionally, in 2013 ISAT testing, LEARN's students outperformed District 60's students overall in reading and mathematics, as well as in those subjects for the Hispanic, low-income, limited English proficiency, and black subgroups. The data also showed that LEARN's students overall fell below the statewide average in reading and mathematics, but exceeded the statewide average in those subjects for the Hispanic, low-income, limited English proficiency, and black subgroups.

¶ 16        The proposal stated that LEARN would utilize the Common Core standards and focus on four core subjects: English language arts, mathematics, science, and social studies. LEARN provided a detailed description of its proposed curriculum on these subjects and noted that its educational plan also placed a "special emphasis" on STEM (science, technology, engineering, and mathematics) learning. LEARN also would ensure that its students received weekly

"enrichment" classes in visual and performance arts, technology, physical education, and Spanish.

¶ 17 LEARN's proposal described how it would meet the needs of ELL students and students with disabilities. Concerning ELL students, the proposal indicated that LEARN would identify them through a survey, use different educational models depending on how many students had been identified, and monitor their progress with various assessments. Concerning students with disabilities, LEARN noted how students would be identified and believed that such students were "better served" with "an inclusion program rather than a pullout program." LEARN accordingly would first attempt to provide accommodations in the general classroom. LEARN also stated that it employed occupational therapists, physical therapists, speech therapists, social workers, counselors, and psychologists.

¶ 18 The proposal discussed LEARN's utilization of data-based instruction, its academic performance goals, its school culture and climate, and what the school calendar and daily schedule would look like. The proposal provided various school policies, including a student code of conduct, school safety protocols, and how teachers would be evaluated. Additionally, the proposal talked about LEARN's student recruitment strategy, the school's proposed operational structure, and many other details necessary to the functioning of a school.

¶ 19 LEARN identified two different locations for the school. The first site, an 18,000-square foot stand-alone facility, was located at 2634 Grand Avenue in Waukegan, and had previously been used as a medical office building. As constructed, the building could support a kindergarten through fifth grade school, but with an addition could support a K-8 school. The facility was available for lease or purchase but would require a zoning variance. Capital improvements were also necessary, and the building had one current tenant. The second site, a 91,000 square foot facility connected to a retail mall, was located at 2700 North Belvidere Road in Waukegan. The building was available only to lease but large enough to accommodate a K-8 school. The building required rezoning and capital improvements. LEARN provided an estimated five- to six-month timeline to make either location operational and noted its past experience in transforming other facilities into schools.

¶ 20 Additionally, LEARN's proposal discussed the finances of LEARN itself and included an audited financial statement as well as provided a budget and budget narrative for the proposed school. According to LEARN's most recent audit, as of June 30, 2012, it had approximately $16.6 million in assets and $8.7 million in liabilities. In each year from 2012 to 2014, LEARN had raised over $3 million. The budget for the proposed school assumed certain enrollment numbers and forecasted the school's financial position for six years, projecting its income, expenses, and potential capital expenditures. Concerning income, LEARN sought a per capita tuition charge of $10,132 but also intended to obtain additional funding from loans, grants, and other contributions from foundations and individuals. Concerning expenses, LEARN stated that, based on its experience, it would need "a contingency expense" equal to 10% of its total expenses to withstand any unexpected costs.

¶ 21 Lastly, the proposal contained the proposed charter agreement between LEARN and District 60, insurance information, and several appendices of documents, including detailed program frameworks for different subjects, sample sequence reports, and a sample Common Core standards teaching training agenda.

D. District 60's Decision

¶ 23      On January 6, 2015, District 60 denied LEARN's proposal, finding several inadequacies, including (1) the lack of community support, (2) "serious flaws and gaps" with the proposed educational program concerning, in particular, services to special education students and ELL students, (3) the lack of "significant achievement" of LEARN North Chicago, which was located in a community with comparable demographics to Waukegan, and (4) "lingering questions about climate and culture in LEARN schools."

¶ 24      Additionally, District 60 determined that the proposed school would not be economically sound and identified multiple issues with the financial aspect of the proposal. These included that LEARN's "year end fund balance was negative indicating a deficit" as of June 30, 2012, and its "current ratio," a measure of liquidity determined by dividing assets by liabilities, was 1.91, thus below "the commonly accepted threshold of 2.0." District 60 also observed that LEARN had not provided audited financial reports from the 2013 fiscal year, suggesting to the district that LEARN's financial position had worsened. District 60 also pinpointed several issues with the school's proposed budget, including that LEARN failed to provide evidence of specific funding sources, did not take into consideration transportation costs for its students, neglected to provide sufficient information on a food service program, and failed to adequately consider the financial impact of serving students with special needs.

¶ 25      Moreover, District 60 found that the proposed school would "cause grievous financial harm" to the district by shifting "scarce" resources away from it. District 60 determined that it would lose nearly $23 million over six years if the school operated as intended, which would "significantly impair[ ]" the district's ability to meet its fixed overhead and operational costs. District 60 further asserted that it would have to make significant reductions in services, forgo current educational initiatives, and add to its $49.6 million of long-term debt.


¶ 26                          E. LEARN's Appeal to the Commission

¶ 27      On February 5, 2015, LEARN appealed District 60's decision to the Commission. In its appeal, LEARN included a memorandum that reiterated the information contained in its proposal, responded to the alleged inadequacies raised by District 60, and included information not contained in its proposal to provide added support and update its proposal "based on progress" that had occurred after the original submission. District 60 did not object to LEARN's request, and the Commission accepted the new information. The additional information included two new proposed locations for the charter school, further financial information, supplementary curriculum information, elaboration on its strategy for serving ELL students, and plans for becoming its own local educational agency.

¶ 28      The first new site was a 32,000-square foot two-story facility located at 800 South Genesee Street in Waukegan. The building was built in 2005; was in excellent condition; and already had more than 30 classrooms, a full gym, a cafeteria, offices, and other space necessary for a school. The building only needed a minimal investment in order to become operational as a school and also could accommodate the school's anticipated growth. LEARN also noted that the building's owner had expressed a desire to lease the facility to it. Given these details, LEARN deemed the site "the most viable option." The second new site was a 37,000-square foot two-story facility located at 202 North Genesee Street in Waukegan. The facility was relatively new and had an open, unfinished design inside that could be refurbished to function as a school more quickly than the original two sites. It was also large enough to accommodate

the anticipated growth of the school. LEARN stated that construction could be performed in phases and segregated from school activities.

¶ 29    LEARN also responded to District 60's assertions concerning its financial health, the projected budget for the school, and the financial impact on the district. LEARN disputed District 60's computation of its year-end fund balance, insisting it was not negative, but rather a positive $7.9 million for the 2012 fiscal year. LEARN provided an update on its current assets and liabilities, which resulted in a current ratio of 2.16 as of January 2015, as well as audited financial statements from 2013 and 2014. According to LEARN, it meant to, but did not, submit the 2013 audit as part of its proposal while the 2014 audit had not yet been completed at the time of the submission. Regarding the school's projected budget, LEARN stated that it had recently authorized funding of up to $1 million in start-up costs for the campus and secured commitments for donations from five donors, which were listed, for approximately $8 million over five years. LEARN further updated its original budget to include a food service plan and disputed District 60's concerns over the sufficiency of its funding plan for special education students.

¶ 30    Concerning the financial impact on District 60, LEARN asserted that, as of the 2013 fiscal year, the district had a fund balance of $37 million, which was higher than the 2011 or 2012 fiscal years. Additionally, LEARN highlighted that District 60 had approximately $36 million of cash on hand, or 75 days' worth, an amount which had been increasing over the past years. LEARN further highlighted that, between 2011 and 2013, District 60 had operated at a surplus every year with its revenues growing every year. LEARN's data also showed that District 60's surplus had decreased each year since 2011 and was approximately $2 million as of 2013. Based on District 60's alleged "robust" financial position, LEARN concluded that, even when considering its request for funding at a 100% per capita tuition charge, its Waukegan campus would represent 1% to 2% of District 60's budget and the district would maintain its "strong financial" position and remain "financially solvent" with the school's presence.

¶ 31    Additionally, LEARN acknowledged that, if it was successful on appeal, its school would not be part of District 60 but rather its own local educational agency. Consequently, LEARN stated that it had conversations with charter schools that were operating as local educational agencies, reviewed revenue data from charter schools authorized by the Commission, and obtained further guidance from its legal counsel. LEARN asserted that it was prepared to dedicate the resources necessary to be fully responsible for the instruction of special education and ELL students and the transportation of its students. LEARN provided corresponding plans on these matters and submitted a revised budget to include the added expenses, including line items on transportation, food service and special education services.

¶ 32    District 60 responded to LEARN's memorandum, arguing that, even when considering the new information on appeal, the proposal still did not satisfy the criteria enumerated in the Charter Schools Law, specifically as it related to serving special education, ELL, and at-risk students; the fiscal capability of LEARN to operate the school; and the financial impact on the district. District 60 also highlighted that, while the proposed location at 800 South Genesee Street had been "described positively," there was no evidence that an architect had reviewed the facility and determined whether a school could operate there. Furthermore, District 60 posited that LEARN did not sufficiently address whether the location could meet the transportation or food service needs of the school. District 60 also included a report prepared

by Dr. Benjamin Ditkowsky, which was based on data from the Illinois Report Card.[2] Dr. Ditkowsky's report acknowledged that the academic performance of LEARN's students "appear[ed] impressive" but could be explained by variables unique to its schools. In particular, the report noted a high rate of attrition of LEARN's students as they matriculated through school grades, suggesting that the students who left the schools were academically inferior to those who remained. Additionally, the report found that the level of chronic truancy, *i.e.*, missing 10 days or more of school the prior year, at LEARN's schools was more than twice the rate of District 60's schools and more than three to four times the statewide average, suggesting that this level of truancy led to lower test participation and higher test scores, as those who took the test were academically superior to those who did not.

¶ 33    LEARN responded to the critiques of its academic success, asserting that the "mobility rate," a statistic measuring the percentage of students who transfer in and out of a school, for its Chicago schools was lower than District 60's schools for each of the past five years and lower than the statewide average for four of the last five years. LEARN acknowledged that its North Chicago school had a high mobility rate, but explained that the school, and the North Chicago Community Unit School District 187 as a whole, had a high percentage of military families who relocated often as part of their careers. Furthermore, LEARN acknowledged that the Illinois Report Card showed that over one-third of its Chicago students were chronically truant but noted that its "[a]ttendance data," also from the Illinois Report Card, showed that its Chicago students attended school at a higher rate than students in District 60 and the statewide average. LEARN stated that the "discrepancy" between its chronic truancy and attendance data was "severe" and would be "investigate[d]."

¶ 34    On March 12, 2015, the Commission, as part of its due diligence process, held interviews with several representatives of LEARN and several representatives of District 60.

¶ 35    Four days later, Dr. Michael Anderson, an education consultant with the Lake County Regional Office of Education, issued a report on whether the facility located at 800 South Genesee Street could pass various safety and health codes. Dr. Anderson observed that the facility was "clean," was well-maintained, and had "many facilities that one would find in a regular public school," such as a large gymnasium, offices, a cafeteria, a kitchen, and several classrooms. Although Dr. Anderson determined that the building met the safety and health codes in several respects, he also found that "a few stairways" did not, some floor tiles "probably contain[ed] asbestos," and certain windows would need to be modified to "allow for quick and easy escape." Dr. Anderson also noted issues with the parking lot and the size of the classrooms.

¶ 36    On March 30, 2015, an employee of LEARN e-mailed the Commission, stating that it was no longer considering the facility at 2634 Grand Avenue due to necessary renovations being too costly. The employee stated that the other three locations were still viable options for the school but highlighted 800 South Genesee Street as the preferred site and noted an architectural review of the facility revealed that the location would be able to open in the fall of 2015 despite "some items" needing "attention."

---

[2]The Illinois Report Card is a compilation of data published annually by ISBE showing how individual schools, school districts, and the state as a whole are performing on a variety of academic performance measures, as well as providing the demographic composition of the schools, districts, and the state. 105 ILCS 5/10-17a (West 2014).

¶ 37    The next day, the Commission held a public hearing. According to a summary of the hearing, 105 people signed in to support LEARN while 80 signed in to support District 60. Among the people who spoke at the hearing, 28 supported LEARN while 29 supported District 60. During the week following the hearing, the Commission received 40 e-mails in support of LEARN and 32 e-mails in support of District 60.

¶ 38    On April 9, 2015, IFF Real Estate Services, LLC (IFF) submitted a "desk review" in response to the Commission's request to assess the feasibility of having a charter school located at 800 South Genesee Street and 2700 North Belvidere Road. In order to render the assessment, IFF reviewed various documentation, including an analysis performed by an architecture firm on each of the properties, LEARN's memorandum on appeal, and a proposed term sheet for 800 South Genesee Street. Concerning 800 South Genesee Street, although IFF generally concluded that the building could be converted to accommodate a charter school, it required clarification on the square footage of the building, noting a discrepancy between LEARN's memorandum on appeal and the proposed term sheet. IFF determined that, if the square footage of the term sheet was correct, LEARN would eventually outgrow the facility, but the facility would be a "good option" if LEARN reduced its proposed student population or increased the size of the facility. Concerning 2700 North Belvidere Road, IFF concluded that the facility could be converted to accommodate the charter school but that it would likely require more funding than the $750,000 LEARN had initially allocated.

¶ 39    On April 15, 2015, the Commission's staff issued a report, recommending that the Commission grant LEARN's appeal with a funding level of 91% of District 60's per capita tuition charge. The report noted that the academic performance in LEARN's schools was "very strong" and highlighted that, in 2013 ISAT testing for low-income students in mathematics and reading, LEARN's schools outperformed all of District 60's schools except for one "admissions-based magnet school." Additionally, in 2014 ISAT testing, LEARN's schools outperformed District 60's schools "in all tested subjects overall, and for low-income/at-risk students." With regard to ELL students, although LEARN had a small population of them at its schools, those attending LEARN North Chicago, a location demographically similar to Waukegan, significantly outperformed both District 60 and the statewide average in reading and mathematics scores in 2014 ISAT testing. The report also indicated that "independent analyses by outside experts confirm LEARN's academic data and do not support [District 60's] challenges," specifically citing Dr. Ditkowsky's analysis.

¶ 40    Concerning LEARN's finances, the report concluded that it had "a 14-year track record of running a financially sound network of charter schools." The report found that District 60's expenses and revenues had risen during the past three years, and although its net income had been declining each year, its cash on hand had increased. The report noted that District 60's enrollment had been "accelerating," which would "significantly offset" the loss of students to the charter school. The report concluded that, contrary to District 60's claim, the district was not "likely to suffer economic hardship" if the Commission granted LEARN's appeal with funding at 91% of the district's per capita tuition charge, the staff's recommended award, or even 100%.

¶ 41    Concerning LEARN's facility plan, the report highlighted that LEARN had built or remodeled four campuses in the past decade. The report found that LEARN had "experience negotiating contracts, obtaining zoning and permits and incentivizing contractors to timely" complete their projects. The report observed that LEARN had identified a total of four

locations for the school, two in its proposal to District 60 and two on appeal to the Commission, but as of April 2015, LEARN had focused on 800 South Genesee Street and 2700 North Belvidere Road. However, the report noted that, given the material available on appeal, independent financial and construction evaluators could not determine whether LEARN would be able to open the Waukegan campus on time. The report further observed that LEARN did not have much experience with ELL or Hispanic students and had never operated a school as a local educational agency. However, the report concluded that, due to LEARN's experience and "track record" of success at its other eight schools, it should have the opportunity to replicate its success in Waukegan. Although the staff recommended granting LEARN's appeal, it suggested that, because of the "limited time for opening in September, 2015," the grant should be contingent on LEARN satisfying a performance agreement that required it to "finalize its facility plan, pre-opening budget, and timeline" by May 15, 2015.

¶ 42    Leading up to the Commission's scheduled public meeting, in which it would vote on LEARN's appeal, set to begin in the afternoon of April 21, 2015, its staff met with representatives from LEARN and District 60. The staff informed the parties that its recommendation was to grant LEARN's appeal subject to the performance agreement.

¶ 43    On the morning of April 21, 2015, the Commission e-mailed the parties with several attachments, including one where the Commission requested District 60 to provide "any evidence and/or verification" on its assertions that it would suffer grievous financial harm if the appeal was granted. That document also informed the parties that two of the commissioners would participate in the meeting by telephone. Another attachment, which was a recommended motion to grant LEARN's appeal, stated that LEARN would be allowed to satisfy the conditions of the performance agreement by July 1, 2015, rather than May 15, 2015.

¶ 44    Shortly after receiving this e-mail, District 60's general counsel, Thomas Morris, replied, objecting to the Commission's request for additional evidence of financial harm because of the short notice. Morris asserted that additional evidence existed but was impossible to gather by the time of the meeting. Morris also complained that it was unfair LEARN would have additional time to satisfy the conditions of the performance agreement while District 60 had been required to meet its deadlines. Morris argued that extending the deadlines to only one party showed that the Commission was biased and acting "arbitrar[ily] and capricious[ly]."

¶ 45                        F. The Commission's Public Meeting

¶ 46    On April 21, 2015, at 3:05 p.m., Greg Richmond, the chairman of the Commission, took roll call. Seven of the commissioners were physically present while two others appeared telephonically, with their telephonic presence being approved unanimously by motion. After tending to a separate matter on the agenda, the Commission heard public comments on LEARN's appeal. Thereafter, the Commission discussed reports from Richmond, its various committees, its legal counsel, and its interim executive director. Commissioner Bill Farmer then made a motion for the Commission to hold a closed session "for the expressed purpose of considering the following subject, consideration of evidence by the Commission or a committee of the Commission as a quasi-[adjudicative] body." The motion passed unanimously, and the Commission adjourned into a closed session.

¶ 47    When the Commission returned to an open session, it began consideration of LEARN's appeal. Hosanna Mahaley-Jones, the interim executive director of the Commission, gave a presentation summarizing the staff's recommendation to grant LEARN's appeal and its two

- 10 -

key reasons: (1) "performance" and (2) "capacity." First, she highlighted that, in ISAT testing, LEARN's schools generally outperformed District 60's schools overall and for low-income students, at-risk students, ELL students, students with disabilities, black students, and Hispanic students. Second, Mahaley-Jones observed that LEARN had a lengthy track record "of running financially sound schools," and although LEARN would be operating as a local educational agency for the first time, it had "the capacity" to do so. She also addressed District 60's concerns about the proposed school and deemed them unwarranted.

¶ 48 Following Mahaley-Jones's presentation, LEARN gave a presentation and requested that it be funded at 100% of District 60's per capita tuition charge, arguing that anything less would result in drastic consequences for the proposed school. District 60 also gave a presentation, in which its outside counsel responded to many of the statements made by Mahaley-Jones and LEARN in their presentations. District 60's counsel further informed the Commission that it could not "sufficiently respond" to the request for additional evidence of financial harm due to its receipt of the request on such short notice. Counsel concluded that LEARN's proposal was not in the best interests of the students the school was designed to serve for various reasons, including that LEARN lacked a viable facility to house the school and was not prepared to undertake the responsibilities required of a local educational agency.

¶ 49 The commissioners subsequently asked questions of LEARN and District 60's representatives and held their own discussions of various issues, including the impact of funding the school at 91% versus 100% of the district's per capita tuition charge and about LEARN's preferred location of 800 South Genesee Street. Eventually, the commissioners voted 5-4 to grant LEARN's appeal to establish the Waukegan charter school at a funding level of 100% of District 60's per capita tuition charge provided that, by July 1, 2015, LEARN had to (1) execute a facility lease, (2) obtain approval from the Commission's staff on a facility plan that would allow the Waukegan campus to open by September 15, 2015, and (3) obtain approval from the Commission's staff on a revised budget plan with a 100% funding level.

¶ 50 On April 29, 2015, the Commission sent a report summarizing its vote to ISBE.

¶ 51 G. The Commission's Written Decision

¶ 52 The next day, the Commission sent LEARN and District 60 its final written decision. In the decision, the Commission discussed several aspects of LEARN's proposal. Concerning the facility plan, the Commission noted that LEARN initially proposed locating its Waukegan campus at either 2634 Grand Avenue or 2700 North Belvidere Road, but observed that LEARN later amended the proposal to include facilities located at 800 South Genesee Street and 202 North Genesee Street. The Commission found that LEARN identified "three viable facilities," all but the 2634 Grand Avenue facility, and noted that the Charter Schools Law only required an applicant to identify two facilities.

¶ 53 Concerning LEARN's finances, the Commission observed that LEARN's assets were $14.8 million while its liabilities were $6.8 million and that LEARN projected a positive net income for the first five years of the Waukegan campus. The Commission noted that LEARN's Waukegan budget contained a 3% contingency and found that LEARN had appropriate internal financial controls and reporting mechanisms. Furthermore, the Commission highlighted that LEARN had raised over $3 million each year since 2012 and had secured enough funding to support the school's start-up costs. The Commission further highlighted that it had a precedent of funding Commission-authorized charter schools at 100% of the local

- 11 -

school district's per capita tuition charge and determined that amount to be the appropriate level of funding for the Waukegan school. The Commission asserted that a 100% funding level "did not materially harm" District 60 or impact its financial solvency, as LEARN's impact on the district's total budget would range from less than 1% in 2016 to slightly more than 2% in 2020. Based on the evidence before it, the Commission concluded that LEARN's proposed Waukegan campus complied with the Charter Schools Law.

¶ 54    The Commission next analyzed if the proposal was in the best interests of the students the school was designed to serve, observing that its analysis focused on the sufficiency of LEARN's educational plan, organizational plan, and business plan and its capacity to execute. The Commission highlighted the superior academic performance of LEARN's students compared to District 60's students, but acknowledged that LEARN's experience with ELL students was "limited." Nevertheless, the Commission noted that LEARN's ELL students "greatly outperformed" the students in District 60 and statewide in reading and mathematics test scores. Moreover, the Commission asserted that LEARN's organizational plan, business plan, and capacity to execute "met or exceeded the standards required." All told, the Commission determined that the proposal was in the best interests of the students the school was designed to serve. Accordingly, the Commission granted LEARN's appeal and reversed District 60's denial subject to LEARN satisfying the conditions of the performance agreement.

¶ 55                              H. Post-Decision Proceedings

¶ 56    Approximately two months later, LEARN submitted the documentation required by the performance agreement, including a lease for a building located at 540 South McAlister Avenue in Waukegan, a facility plan with a renovation schedule, and a revised budget. On July 1, 2015, the Commission's staff issued a compliance report, finding that LEARN had complied with all of the requirements of the performance agreement. Consequently, on that same day, LEARN and the Commission executed a charter agreement for a term of five years. The Commission subsequently informed ISBE of the agreement. Over the next two months, LEARN worked with ISBE to clarify and correct some issues with the charter agreement. Ultimately, on August 27, 2015, ISBE certified the charter.

¶ 57                              I. Circuit Court Proceedings

¶ 58    On June 4, 2015, District 60 filed a complaint in the circuit court against the Commission, ISBE, and LEARN, alleging four counts. Count I sought administrative review against all three defendants and alleged that the Commission's decision to grant LEARN's appeal was clearly erroneous because LEARN failed to (1) provide two viable facilities for the charter school, (2) propose an adequate educational plan for the school, in particular for ELL students and students with disabilities, (3) submit a complete description of the governance and operations of the school, (4) demonstrate how it would meet the needs of Waukegan's high population of at-risk students, and (5) provide sufficient evidence to show that the terms of the charter were economically sound for both the school and District 60. In addition, District 60 claimed that the Commission's decision was "late and unlawful" because it e-mailed ISBE the vote summary "after 5:00 p.m. on April 30th," or "after the close of business on the seventh day after the Commission's meeting approving the charter school." Further, District 60 alleged that the Commission set conditions under which it would approve LEARN's appeal "without

the legal authority to do so" and had "exceed[ed] its jurisdiction" when it gave LEARN until July 1, 2015, to satisfy the performance agreement.

¶ 59       Count II alleged that the Commission violated the Open Meetings Act (5 ILCS 120/1 *et seq.* (West 2014)) when it allowed two commissioners to participate telephonically without prior notice and a lawful justification. Count III alleged that the Commission violated the Open Meetings Act (*id.*) by holding a closed session without identifying a proper exception. Lastly, count IV sought a declaratory judgment against all three defendants, seeking a declaration that the Commission's decision was clearly erroneous.

¶ 60       Approximately a week later, District 60 filed an unsuccessful emergency motion to stay the final decision of the Commission pending resolution of its lawsuit. Eventually, on June 23, 2016, following several motions being filed and various briefings, the circuit court affirmed the Commission's decision to grant LEARN's appeal and dismissed counts II, III, and IV of District 60's complaint, finding that administrative review was the sole means for District 60 to obtain relief and the counts were "duplicative of the relief sought by way of administrative review." District 60 timely appealed.[3, 4]

¶ 61                                    II. ANALYSIS
¶ 62                      A. Compliance With Supreme Court Rules
¶ 63       Initially, we must address ISBE and the Commission's contention that District 60's opening brief violated our supreme court rules in multiple respects. While we agree that District 60 violated multiple rules by not providing a citation to authority for its purported standard of review (Ill. S. Ct. R. 341(h)(3) (eff. Nov. 1, 2017)), copiously arguing and failing to provide appropriate references in several places to the record on appeal in its statement of facts (Ill. S. Ct. R. 341(h)(6) (eff. Nov. 1, 2017)), and neglecting to include a complete appendix with the required documents (Ill. S. Ct. R. 342 (eff. July 1, 2017)), we disagree with ISBE and the Commission that we should sanction these violations by dismissing District 60's appeal or striking its brief. Such punishments are permissible for violating the supreme court rules, but they are particularly harsh. *North Community Bank v. 17011 South Park Ave., LLC*, 2015 IL App (1st) 133672, ¶ 14. Although we do not find such a punitive sanction warranted in this case, we will disregard any arguments raised by District 60 in its statement of facts and consider only those properly raised in the argument section of its brief. Thus, despite District 60's noncompliance with the rules, we nevertheless consider the merits of its appeal.

---

[3]District 60's notice of appeal stated that it was appealing from the circuit court's June 23, 2016, order that affirmed the Commission's decision but also from the court's order that denied the district's emergency motion for a stay. However, District 60 has not raised any arguments on appeal related to this motion. Accordingly, any argument concerning the propriety of the denial of the motion has been forfeited on appeal. See Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017); *Goldberg v. Rush University Medical Center*, 371 Ill. App. 3d 597, 604 (2007).

[4]Although LEARN is a party to this appeal, it has not filed any briefs nor has it moved to adopt the joint briefs of the Commission and ISBE.

District 60 first contends that the Commission and ISBE lost jurisdiction over LEARN's appeal and certification because they both failed to follow the timeline established by the Charter Schools Law.

The Charter Schools Law outlines the timeline in which various actions by the Commission and ISBE should occur. 105 ILCS 5/27A-1 *et seq.* (West 2014). Following a public hearing on a charter school applicant's appeal, the Commission has 30 days to vote to either grant or deny the appeal, which must occur at a public meeting. *Id.* § 27A-8(e), (g). The statute then provides that:

> "Within 7 days of the public meeting ***, the [Commission] shall file a report with [ISBE] granting or denying the proposal. If the [Commission] has approved the proposal, within 30 days of receipt of the [Commission's] report, [ISBE] shall determine whether the approved charter proposal is consistent with the provisions of [the Charter Schools Law] and, if the approved proposal complies, certify the proposal ***." *Id.* § 27A-8(f), (g).

Although section 27A-8(f) of the Charter Schools Law provides a timeline with respect to a local school board's approval of a charter school, section 27A-8(g) makes clear that the timeline imposed in section 27A-8(f) applies equally to when the Commission considers an appeal of a charter school denial by the school board. See *id.* § 27A-8(g) ("[T]he Commission shall follow the same process and be subject to the same timelines for review as the local school board.").

The parties do not dispute the timeline of events in this case. On April 21, 2015, the Commission voted at a public meeting to grant LEARN's appeal. Eight days later, on April 29, 2015, the Commission submitted the report of its vote to ISBE, who ultimately certified the charter between LEARN and the Commission on August 27, 2015, well after the outlined 30-day time period. According to District 60, the Commission's noncompliance with the 7-day reporting command and ISBE's noncompliance with the 30-day certification command resulted in them losing jurisdiction over LEARN's appeal and rendering them unable to reverse District 60's denial and certify the charter school, respectively. Furthermore, District 60 argues that the Commission and ISBE's failure to comply with the timeline prejudiced the district because it created uncertainty in its staffing, enrollment, and budget. The Commission and ISBE respond, arguing that they did not lose jurisdiction over LEARN's appeal and certification because the statutory language is merely directory, not mandatory.

Whether a statutory command is directory or mandatory is a question involving statutory construction that we review *de novo*. *In re M.I.*, 2013 IL 113776, ¶ 15. "When construing a statute, our primary objective is to ascertain and give effect to legislative intent, the surest and most reliable indicator of which is the statutory language itself, given its plain and ordinary meaning." *Id.* If a "statute expressly prescribes a consequence for failure to obey a statutory provision, that is very strong evidence the legislature intended that consequence to be mandatory." *People v. Robinson*, 217 Ill. 2d 43, 54 (2005). Therefore, under the mandatory-directory dichotomy of statutory construction, it is not the use of obligatory language, such as the word "shall," that determines whether a statutory command is mandatory or directory, but rather whether noncompliance with such language dictates a resulting consequence. *Id.*

¶ 69    When a procedural command to a government entity is at issue, we begin with the presumption that the command is directory. *People v. Geiler*, 2016 IL 119095, ¶ 18. This presumption may be overcome, and thus the procedural command reads as mandatory, if "(1) negative language in the statute or rule prohibits further action in the case of noncompliance or (2) the right the statute or rule is designed to protect would generally be injured under a directory reading." *Id.* "It has long been held that statutory requisitions directed to government officials designed to secure order, system and dispatch in proceedings are usually directory rather than mandatory." (Internal quotation marks omitted.) *Robinson*, 217 Ill. 2d at 56. But if these requisitions "are intended for the protection of the citizen, *** and by a disregard of which his rights might be and generally would be injuriously affected, they are not directory but mandatory." (Internal quotation marks omitted.) *Id.* If the procedural command is deemed mandatory and the government entity fails to comply with the required act, we must invalidate the government action. *In re M.I.*, 2013 IL 113776, ¶ 16.

¶ 70    In this case, we begin with the presumption that the procedural commands at issue—the Commission's 7-day reporting command and ISBE's 30-day certification command—are directory rather than mandatory. District 60 has failed to overcome this presumption. First, section 27A-8 of the Charter Schools Law (105 ILCS 5/27A-8 (West 2014)) does not utilize any negative language prohibiting further action in the case of noncompliance nor does this section dictate a particular consequence for either the Commission or ISBE's failure to comply with the commands. Notably, District 60 fails to identify any language, seemingly conceding this point.

¶ 71    Second, before analyzing whether a directory reading would generally injure the right the statutory provision is designed to protect, we must determine what right the provision protects. See *In re M.I.*, 2013 IL 113776, ¶ 24. Our review of the legislative history of the Charter Schools Law does not reveal an explicit right to be protected by the Commission's 7-day reporting command or ISBE's 30-day certification command. District 60, however, suggests that the timeline is intended to protect impacted school districts and their students from uncertainty in staffing, enrollment, and budgetary matters that result from delayed proceedings. District 60's argument is true to a degree, as this timeline helps give local school districts, whose funding and enrollment are necessarily affected by the existence of charter schools in their districts, clarity. The same could be said for charter school applicants themselves, who similarly have to budget limited resources and also need clarity in the resolution of their proposals. While clarity to the parties may be a partial benefit of the timeline in the Charter Schools Law, it is only ancillary to the true purpose of the timeline, which is to provide guidance to government officials to help expedite proceedings and keep them moving in an orderly process. In other words, the timeline does not protect a specific right but rather helps ensure that the proceedings do not become unnecessarily delayed.

¶ 72    Nevertheless, even giving credence to District 60's argument that the timeline is designed to protect school districts from uncertainty in various matters, we disagree that it is a directory reading that generally causes this uncertainty. Regardless of a directory or mandatory reading of the statutory timeline, there will always be uncertainty. That is simply the nature of the Commission's appeals process or any other unresolved proceeding. The uncertainty cannot be removed until an appeal or proceeding is resolved. Thus, District 60's alleged uncertainty has nothing to do with a directory or mandatory reading of the statutory timeline but rather is inherent in unresolved proceedings. To the extent that District 60 argues that a directory

reading exacerbates this uncertainty above and beyond the normal uncertainty produced by unresolved proceedings, we also disagree. Had the Commission missed its 7-day reporting command and ISBE missed its 30-day certification command much earlier in the calendar year, for example in January and February, District 60 would have no basis for arguing that these missed deadlines somehow caused any exacerbated uncertainty for its subsequent year's staffing, enrollment, or budget.

¶ 73        It is only because the missed deadlines occurred much closer to the beginning of the school year that this alleged uncertainty in District 60's operations manifested itself. Thus, while in this specific case, a directory reading of the statutory timeline might have injured a right the provision was designed to protect, District 60 fails to convince us that this holds true under general circumstances. See, *e.g.*, *Geiler*, 2016 IL 119095, ¶ 23 (finding that "a defendant may be prejudiced by a Rule 552 violation if there is a lengthy delay in transmitting a citation in a given case, but no reason exists to believe that would generally be true"); *Robinson*, 217 Ill. 2d at 57 (finding that, "[w]hile the right to appeal might be injured by untimely service in a given case, there is no reason to believe that it generally would be"). Moreover, District 60's assertion that it was prejudiced from the Commission and ISBE's failure to comply with the timeline is belied by the fact that it knew the Commission had voted to grant LEARN's appeal on April 21, 2015, subject to LEARN satisfying the performance agreement, well in advance of the beginning of the 2015-2016 school year. Consequently, we find that the Commission's 7-day reporting command and ISBE's 30-day certification command are directory.

¶ 74        Furthermore, District 60's reliance on *McReynolds v. Civil Service Comm'n*, 18 Ill. App. 3d 1062 (1974), is unpersuasive. In that case, the plaintiff, a state employee, was suspended without pay and two weeks later received a notice of discharge. *Id.* at 1063. The plaintiff subsequently sought a hearing on the matter, which occurred 47 days later. *Id.* Following the hearing, a hearing officer recommended that the plaintiff be discharged, a recommendation that was eventually adopted by the Civil Service Commission. *Id.* Thereafter, the plaintiff filed a complaint for administrative review, arguing that the Civil Service Commission lost jurisdiction over her case because it failed to hold the hearing within 30 days of her request. *Id.* The statutory provision at issue stated that, " '[u]pon the filing of such a request for a hearing, the Commission shall grant a hearing within thirty days.' " (Emphasis omitted.) *Id.* at 1064 (quoting Ill. Rev. Stat. 1971, ch. 127, ¶ 63b111). The circuit court agreed with the plaintiff and reversed the decision of the Civil Service Commission. *Id.* at 1063. The Civil Service Commission appealed, arguing that the 30-day command was directory, not mandatory. *Id.* at 1063-64.

¶ 75        This court observed that the purpose of the statutory provision at issue was to provide "employees certain procedural protections when they were being considered for discharge, demotion or suspension," namely "a timely hearing and a speedy adjudication of disciplinary charges." *Id.* at 1065. To this end, the time limitation not only ensured "fairness to the employee but serve[d] to prevent the employee from suffering monetary injury." *Id.* at 1066. In other words, without a mandatory reading, the employee would be unable to collect a salary, which would always result in a direct monetary injury. *Id.* Thus, we found the statutory timeline was mandatory. *Id.* at 1067.

¶ 76        In contrast to *McReynolds*, where the timeline was intended for the protection of the employee, in this case, the timeline is designed to ensure order and efficiency in the proceedings rather than protect a specific right. Furthermore, even accepting District 60's

argument that the timeline is designed to protect school districts from uncertainty in various matters, the district has only shown that a directory reading of the timeline would, in certain circumstances, injure a right the provision is designed to protect. However, in *McReynolds*, a directory reading of the timeline at issue would always injure the right the provision was designed to protect. Accordingly, because the Commission's 7-day reporting command and ISBE's 30-day certification command are directory, the Commission did not lose jurisdiction over LEARN's appeal and ISBE did not lose jurisdiction over the certification of LEARN's charter.

¶ 77                      C. The Propriety of the Commission's Decision

¶ 78      District 60 next contends that, because LEARN's proposal and supplemental information on appeal did not satisfy the requirements of the Charter Schools Law, the Commission's decision to grant LEARN's appeal was improper. Specifically, District 60 argues that LEARN's proposal did not (1) identify two viable locations for the school, (2) demonstrate that the terms of the proposed charter were economically sound for the district and the school, (3) include an educational program sufficient to meet the needs of students in the district, in particular ELL and special education students, (4) demonstrate the capability to meet the needs of at-risk students, and (5) demonstrate it was in the best interests of the students the school was designed to serve.

¶ 79      Pursuant to the Charter Schools Law, the Commission could reverse District 60's denial of LEARN's proposal if it found the proposal was "in compliance with [the law]" and "in the best interests of the students the charter school" was designed to serve. 105 ILCS 5/27A-8(h) (West 2014). To be in compliance with the Charter Schools Law, a proposal must, *inter alia*, identify "at least 2 sites that are potentially available as a charter school facility by the time the charter school is to open," provide "[e]vidence that the terms of the charter as proposed are economically sound for both the charter school and the school district," and provide a description of the proposed school's educational program. *Id.* § 27A-7(a)(3), (7), (9). When determining whether a proposal is in compliance, the Commission conducts a *de novo* review, affording no deference to the school board's findings. 23 Ill. Adm. Code 650.110(d)(1) (2012). The Commission also does not have to rely on only the information contained in the initial proposal and may accept additional information on appeal. 23 Ill. Adm. Code 650.100(e) (2015). The Commission's final decision is reviewable under the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2014)). 105 ILCS 5/27A-8(h) (West 2014).

¶ 80      In administrative review, we review the decision and reasoning of the administrative agency, here the Commission, not that of the circuit court. *Doe Three v. Department of Public Health*, 2017 IL App (1st) 162548, ¶ 25. The applicable standard of review "depends upon whether the question presented is one of fact, one of law, or a mixed question of fact and law." *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 50. The factual findings of an administrative agency are held as *prima facie* true and correct (735 ILCS 5/3-110 (West 2014)), and we will not disturb those findings unless they are against the manifest weight of the evidence, which occurs only when "the opposite conclusion is clearly evident." *Beggs*, 2016 IL 120236, ¶ 50. We review pure questions of law *de novo*. *Id.* Finally, mixed questions of law and fact "examine[ ] the legal effect of a given set of facts" or, in other words, involve whether uncontested facts have satisfied a statutory standard. *Id.* We review these questions under the clearly erroneous standard. *Id.* Clear error

occurs only "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Id.* We will determine the appropriate standard of review for each of District 60's arguments in our discussion on each argument.

¶ 81                                    1. Location of the Proposed Charter School

¶ 82       We begin with District 60's argument that LEARN's proposal was deficient because it did not identify two "viable" locations for the charter school. District 60 asserts that, during the proceedings, facilities that had been identified by LEARN were taken out of consideration for various reasons and highlights that the eventual location of the charter school was not even among the locations identified in LEARN's initial proposal nor the supplemental locations submitted to the Commission on appeal. Based on this, District 60 concludes that "LEARN did not submit even one potential viable site" for the location of the charter school.

¶ 83       Under section 27A-7(a)(3) of the Charter Schools Law, the proposal must include:

> "A description of and address for the physical plant in which the charter school will be located; provided that nothing in the Article shall be deemed to justify delaying or withholding favorable action on or approval of a charter school proposal because the building or buildings in which the charter school is to be located have not been acquired or rented at the time a charter school proposal is submitted or approved or a charter school contract is entered into or submitted for certification or certified, so long as the proposal or submission identifies and names at least 2 sites that are potentially available as a charter school facility by the time the charter school is to open." 105 ILCS 5/27A-7(a)(3) (West 2014).

District 60 does not contest that LEARN identified two sites in its proposal and identified two additional sites in its memorandum on appeal to the Commission but, rather, seemingly contests whether these facts satisfied the statutory standard. Thus, we review this issue under the clearly-erroneous standard. See *Beggs*, 2016 IL 120236, ¶ 50.

¶ 84       In LEARN's proposal to District 60, it identified two locations for the charter school, one at 2634 Grand Avenue and the other at 2700 North Belvidere Road. The proposal provided a description of the locations, discussed the options available for acquiring use of them, and briefly detailed the improvements necessary for them to operate as a school. Upon appeal to the Commission, LEARN provided a memorandum and identified two additional locations, one at 800 South Genesee Street and the other at 202 North Genesee Street. LEARN also provided a description of the locations and briefly detailed the improvements necessary for them to operate as a school. The memorandum suggested that the newly identified locations were more feasible than the ones identified in the proposal to District 60. During the pendency of LEARN's appeal before the Commission, various documents detailed the feasibility of, and issues associated with, operating a charter school at the locations identified by LEARN.

¶ 85       Based on this information, the Commission's written decision observed that, upon further due diligence by LEARN on all four locations, 2634 Grand Avenue was no longer viable due to prohibitive costs and 2700 North Belvidere Road would require a longer conversion process. Despite the longer conversion process at 2700 North Belvidere Road, the Commission concluded that LEARN had still identified "three viable facilities" for the charter school, which satisfied the requirement of the Charter Schools Law to identify two sites that were potentially available.

¶ 86        We agree with the Commission that LEARN satisfied the statutory standard. While LEARN ultimately did not select any of the four locations for the eventual home of its school, nothing in the Charter Schools Law requires this. Despite District 60's assertion that, at the time of the Commission's public meeting, only the property at 800 South Genesee Street was still being considered by LEARN, we do not find it unfathomable that, after a charter school applicant has identified potential locations, further due diligence would reveal those locations as unsuitable for a multitude of rational reasons. The critical fact is that, at the time LEARN submitted its proposal to District 60 and at the time it submitted its memorandum to the Commission on appeal, LEARN had identified at least two locations in each submission that were "potentially available," the only standard the Charter Schools Law requires. See 105 ILCS 5/27A-7(a)(3) (West 2014). Nothing in the record on appeal demonstrates that the locations were unavailable for use when LEARN proposed them. Therefore, we are not left with a definite and firm conviction that the Commission committed a mistake in finding that LEARN satisfied this statutory requirement. Accordingly, the Commission's finding was proper.

¶ 87                                    2. Economic Soundness

¶ 88        District 60 next argues that LEARN failed to demonstrate the terms of the proposed charter were economically sound for both the district and the school. Concerning itself, District 60 asserts that, during the public meeting on LEARN's appeal, the commissioners focused their discussion on the impact on LEARN of funding the school at 91% or 100% of the district's per capita tuition charge, but neglected to discuss how it would impact the district itself. District 60 further posits that the record is devoid of any sound economic analysis of the proposed charter school's impact on the district. Concerning LEARN, District 60 asserts that LEARN failed to demonstrate that it was fiscally capable of operating a school in Waukegan, especially in light of the additional responsibilities it would have as a local educational agency.

¶ 89        Before discussing the Charter Schools Law requirement of economic soundness, it is important to understanding generally how a charter school is funded. As previously mentioned, a charter school is a tuition-free public school (*id.* § 27A-5(a), (e); *Comprehensive Community*, 216 Ill. 2d at 458), but how the school is funded depends on who is its authorizer. When a local school board approves a charter school proposal, it becomes the authorizer. 105 ILCS 5/27A-6(a) (West 2014). In such cases, part of the funding for the charter school is determined by an agreement between the local school board and the charter school based on a percentage (at the time, 75% to 125%) of the local school district's per capita tuition charge multiplied by the number of students enrolled in the charter school who reside in the district. *Id.* § 27A-11(b).

¶ 90        However, when a local school board denies a charter school proposal and the Commission subsequently grants the appeal, the Commission becomes the school's authorizer. *Id.* § 27A-9(f). In such cases, the Commission determines the level of funding, also using a percentage of the local school district's per capita tuition charge multiplied by the number of students enrolled in the charter school who reside in the district, but the school obtains the funding directly from ISBE. See *id.* (stating that ISBE "shall withhold from funds otherwise due the district the funds authorized by [the Charter Schools Law] to be paid to the charter school and shall pay such amounts to the charter school"). Thus, regardless of who authorizes

- 19 -

the charter school, funding that normally would go to a district's traditional schools is diverted to the charter school.

¶ 91    Now turning to District 60's economic soundness argument, under section 27A-7(a)(9) of the Charter Schools Law, a charter school proposal must include "[e]vidence that the terms of the charter as proposed are economically sound for both the charter school and the school district." *Id.* § 27A-7(a)(9). Although what constitutes economic soundness is not explained in the regulations, our supreme court has defined the term as meaning " 'financial security' or 'solvency.' " *Comprehensive Community*, 216 Ill. 2d at 477 (quoting Webster's Third New International Dictionary 2177 (1986)). In *Comprehensive Community*, our supreme court stated that the entity proposing the charter school must not only present evidence that the school would be financially sound, but also that the district would remain financially secure and solvent with the presence of the charter school. *Id.* Thus, the local school district's finances must be considered in any analysis. *Id.* However, economic soundness "is not a bright-line standard, but rather a continuum." *Id.* at 481. "The terms of some charter school proposals will be more economically sound for a school district than other proposals, depending upon their effects on the district's bottom line." *Id.*

¶ 92    District 60 does not appear to dispute any of the factual findings of the Commission on its finances or LEARN's but rather asserts that, despite these facts, LEARN's proposal did not demonstrate economic soundness. In this regard, we view the issue presented as a mixed question of law and fact, as we must determine whether the established facts have satisfied the statutory standard. *Beggs*, 2016 IL 120236, ¶ 50. On such questions, we review for clear error. *Id.*; see also *Comprehensive Community*, 216 Ill. 2d at 477-78 (reviewing for clear error whether a charter school proposal satisfied the economic soundness requirement when the main facts of the local school district's finances were not in dispute). On mixed questions of law and fact, we give significant deference to the Commission's findings, as it has the experience in construing and applying the Charter Schools Law. *Comprehensive Community*, 216 Ill. 2d at 472.

¶ 93    In the Commission's written decision, it found that, based on all of the documentation submitted in the appeal, LEARN had a lengthy track record of operating financially sound charter schools, had been successful in fundraising, and its assets exceeded its liabilities. Furthermore, during the public meeting, LEARN's CEO, Gregory White, answered questions from the commissioners. One commissioner asked White about LEARN's cash reserves, and White responded that LEARN had 45 days of cash reserves, which was sufficient to "support any school that may be falling down, as far as the finances." The Commission's written decision also observed that LEARN had "put forward a comprehensive plan *** to suggest that it has the operational capacity" to operate as its own local educational agency and had submitted a satisfactory budget to operate as one.

¶ 94    Concerning District 60's finances, in the Commission's written decision, it found that funding the proposed charter school at 100% of the district's per capita tuition charge "did not materially harm" District 60 or impact its financial solvency, as LEARN's impact on the district's total budget would range from less than 1% in 2016 to slightly more than 2% in 2020. Moreover, during the public meeting, one of the commissioners asked if District 60's 2015 budget was accurate concerning a $7.3 million deficit in its educational fund and a $2.8 million deficit in its operations maintenance fund. A representative of District 60 responded that the figures were accurate, adding that the operations maintenance fund included capital costs,

which would not decrease in the future due to the district's use of older buildings. The representative explained the chief cause of the deficits was decreasing property taxes in the district. She also stated that, due to these deficits, District 60 had already made various "cuts." The commissioner pointed out that, in all likelihood due to District 60's financial position, its per capita tuition charge would decrease, which LEARN would need to consider in its own budgetary analysis. Additionally during the public meeting, the commissioners spent time addressing issues related to funding the charter school at 91% and 100% of District 60's per capita tuition charge and the impact on both parties. At one point during the meeting, a commissioner stated "there is evidence" that funding the charter school at 91% or 100% of District 60's per capita tuition charge "would cause harm to [District 60] *** given [its] financial situation." The commissioner added that this was a "concern" of his.

¶ 95     In this case, the record plainly shows that the Commission reviewed the relevant financial information and considered not only the financial feasibility of the proposed charter school, as supported in part by LEARN, but also District 60's finances. Critically, we give significant deference to the Commission's findings on these matters, as it has the experience in construing and applying the Charter Schools Law. See *Comprehensive Community*, 216 Ill. 2d at 472. This is so because the Commission is comprised of members who "collectively possess strong experience and expertise in public and nonprofit governance, management and finance, public school leadership, higher education, assessments, curriculum and instruction, and public education law." 105 ILCS 5/27A-7.5(d) (West 2014). Given the fact that the Commission possesses the superior knowledge in analyzing the relevant economics of schools compared to us, nothing in this record leaves us with a definite and firm conviction that the Commission committed a mistake in finding that LEARN satisfied the economic-soundness requirement.

¶ 96     Nevertheless, District 60 posits that the Commission failed to complete a "sound economic analysis" of the charter school proposal and claims that the Commission's staff admitted as much at the public meeting. At that meeting, Hosanna Mahaley-Jones, the interim executive director of the Commission, informed the commissioners that the staff did not obtain a "second [financial] analysis with our independent consultants" on LEARN's proposal, an analysis the staff generally obtained in other appeals. However, Mahaley-Jones explained that the staff only had a set amount of money "to fund an appeal," and it had to use those resources to investigate other concerns of District 60, including Dr. Ditkowsky's analysis of the academic performance of LEARN's schools. Although the staff did not obtain an independent financial analysis of LEARN's proposal, it is clear that, based on Mahaley-Jones's statements and other parts of the record, the staff conducted its own detailed financial analysis. District 60's claim otherwise is therefore without merit. Accordingly, the Commission did not commit clear error and its finding on economic soundness was proper.

¶ 97                                    3. Educational Program

¶ 98     District 60 next argues that LEARN's proposed educational program was insufficient to serve the needs of the students in the district, in particular ELL and special education students. District 60 asserts that, at the time the Commission held its public meeting, there was no evidence that LEARN had begun to develop a comprehensive special education program, had the capacity to function as its own local educational agency, or had the experience and ability to operate a robust ELL program. As District 60's argument essentially contests the factual findings by the Commission on LEARN's educational plan, we review this question under the

manifest-weight standard, reversing only if the opposite conclusion is clearly evident. See *Beggs*, 2016 IL 120236, ¶ 50.

¶ 99    Under section 27A-7(a)(5) and (a)(7) of the Charter Schools Law, the charter school proposal must include "[t]he goals, objectives, and pupil performance standards to be achieved by the charter school" and "[a] description of the charter school's educational program, pupil performance standards, curriculum, school year, school days, and hours of operation." 105 ILCS 5/27A-7(a)(5), (7) (West 2014). Furthermore, charter schools must comply with all federal and state laws and regulations "applicable to public schools that pertain to special education and the instruction of [ELL students]." *Id.* § 27A-5(g).

¶ 100    LEARN's original proposal included information about how it would support and enrich the learning of traditional students, as well as ELL students and special education students. Upon appealing to the Commission and realizing that if its appeal was granted it would operate as its own local educational agency, LEARN submitted additional information on how it would support ELL and special education students. Based on this information, in the Commission's written decision, it found that LEARN's educational plan would follow the Common Core standards but would be supplemented with a curriculum that had "been heavily researched" and shown to have "strong positive growth for all student demographic groups, including educationally disadvantaged minority, low-income, and ELL populations." The Commission's decision also stated that, based on LEARN's proposal and the additional information submitted on appeal, its staff and an independent evaluator visited LEARN's North Chicago campus, directly observed classroom instruction, and interviewed ELL students and the ELL coordinator. From this, the Commission concluded that the school culture and climate at the North Chicago campus were "conducive to learning," the "academic performance and growth by ELL and special education students" were "proficient," and the ELL coordinator was "knowledgeable, experienced and had a vision for an ELL program across campuses."

¶ 101    The Commission further found that LEARN would place students requiring "Individual Education Plans in the least restrictive environment," which meant accommodating those students first in the general classroom, but if necessary through "self-contained/resource rooms with learning resource teachers." Additionally, the Commission highlighted that LEARN employed "a full range of specialists," including occupational therapists, physical therapists, speech and language therapists, social workers, counselors, and psychologists.

¶ 102    District 60, in essence, asks us to find LEARN's educational plan, especially as it relates to ELL and special education students, insufficient despite the Commission, who has the expertise and experience in reviewing and evaluating these precise matters, finding the plan sufficient. When reviewing the findings of fact from an administrative agency, we cannot simply reweigh the evidence and substitute our judgment in for that of the agency. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). Nothing in LEARN's proposal or its supplemental information submitted on appeal demonstrates to us that the opposite conclusion reached by the Commission is clearly evident. Accordingly, the Commission properly found that LEARN had proposed a sufficient educational program for its Waukegan campus and in particular for ELL and special education students.

¶ 103                                    4. At-Risk Students

¶ 104        District 60 next argues that the Commission did not have adequate support to find that LEARN would sufficiently serve at-risk students. Specifically, District 60 asserts that the Commission ignored evidence from the district that the levels of truancy at LEARN's schools were significantly higher than the district and three to four times higher than the statewide average. District 60 appears to base this argument on Dr. Ditkowsky's report, which was based on data from the Illinois Report Card.

¶ 105        In enacting the Charter Schools Law, our legislature declared that one of the law's purposes was "[t]o increase learning opportunities for all pupils, with special emphasis on expanded learning experiences for at-risk pupils," which are defined as students "who, because of physical, emotional, socioeconomic, or cultural factors, [are] less likely to succeed in a conventional educational environment." 105 ILCS 5/27A-2(b)(2), 27A-3 (West 2014). As District 60's argument contests the factual findings by the Commission on LEARN's ability to meet the needs of at-risk students, we review this question under the manifest-weight standard, reversing only if the opposite conclusion is clearly evident. See *Beggs*, 2016 IL 120236, ¶ 50.

¶ 106        In the Commission's written decision, it found that LEARN's "academic performance overall is worth special note given that LEARN serves a high-needs student population." The Commission also determined that its "staff found that LEARN's academic performance in its network of eight existing schools exceeded Waukegan District 60's performance and that LEARN's superior performance could be observed overall, and with respect to low income and at-risk students." District 60 essentially argues that, because Dr. Ditkowsky's report showed a statistically higher level of chronic truancy at LEARN's schools compared to District 60's schools and the statewide average, that alone forecloses the possibility that LEARN could sufficiently serve at-risk students. The Commission did not find that such a conclusion was warranted.

¶ 107        First, in a document submitted to the Commission on appeal, LEARN responded to Dr. Ditkowsky's report, acknowledging that over one-third of its Chicago students had chronic truancy, but noted its "[a]ttendance data," also from the Illinois Report Card, showed its students attended school at a higher rate than District 60's students and the statewide average. Here, the Commission was faced with conflicting evidence on truancy and attendance data, and it was the Commission's responsibility to weigh the evidence and resolve the apparent conflict. See *Plowman v. Department of Children & Family Services*, 2017 IL App (1st) 160860, ¶ 24. The Commission did just that, as its decision indicated that its staff "conducted an independent study to review" the concerns raised in Dr. Ditkowsky's report. The Commission's study not only concluded that the concerns were unsupported by the data but also "reaffirmed LEARN's high quality performance on the vast majority of metrics."

¶ 108        Second, even if LEARN's truancy data reflected negatively on its schools, this is only one measure in determining whether a charter school can adequately serve the needs of at-risk students. The Commission's decision focused primarily on the academic success of LEARN's students, who, despite being comprised of high populations of at-risk students, generally outperformed District 60's students in ISAT testing. Nothing in the record demonstrates to us that an opposite conclusion than that reached by the Commission is clearly evident. Accordingly, the Commission properly found that LEARN could sufficiently meet the needs of at-risk students at its proposed Waukegan campus.

¶ 109                                        5. Best Interests of the Students

¶ 110          Although we have rejected District 60's arguments concerning whether the Commission properly found that LEARN's proposal was in compliance with the statutory requirements of the Charter Schools Law, the district lastly argues that the Commission erroneously found that LEARN's proposal was in the best interests of the students the charter school was intended to serve. In support, District 60 asserts that, at the Commission's public meeting, it did not discuss whether the proposal was in the best interests of the students and that its written decision merely contained "boilerplate conclusory statements" on the issue. District 60 posits that the Commission had no basis for finding the proposal was in the best interests of the students.

¶ 111          As previously discussed, the Commission may only reverse a local school board's decision to deny a charter school proposal if the Commission finds that the proposal (1) "is in compliance with" the Charter Schools Law and (2) "in the best interests of the students the charter school is designed to serve." 105 ILCS 5/27A-8(h) (West 2014). Although the regulations do not expound on this requirement, this court has previously examined the requirement by focusing on the overall purpose of the Charter Schools Law, *i.e.*, a means to provide alternative public education models that are innovative and flexible. *Board of Education of Rich Township High School District No. 227 v. Illinois State Board of Education*, 2011 IL App (1st) 110182, ¶¶ 101-04 (citing 105 ILCS 5/27A-2(a)(2) (West 2008)). We review whether the Commission properly found LEARN's proposal was in the best interests of the students it was designed to serve for clear error, deferring significantly to the Commission because of its experience in construing and applying the statute. *Id.* ¶ 100.

¶ 112          In the Commission's written decision, it asserted that LEARN provided evidence that it had "the capacity to provide Waukegan public school student[s] with a high quality education option that is not currently available to them," especially given LEARN's demonstrated past success in operating charter schools. The Commission based this finding on its staff's "independent analysis" of LEARN's proposal, which focused on LEARN's educational plan, organizational plan, business plan, and "evidence of capacity." The staff's analysis determined that the academic success of LEARN's schools "exceeded Waukegan District 60's performance and that LEARN's superior performance could be observed overall, and with respect to low income and at-risk students." Further, the staff acknowledged that LEARN's experience with ELL students was limited, but found that the ELL students at its North Chicago campus "greatly outperformed both Waukegan District 60 and the State ELL reading average." The staff also believed that LEARN's organizational plan, business plan, and the capacity of LEARN to execute on the plans met or exceeded the standards required by law.

¶ 113          In light of the Commission's findings, LEARN has demonstrated that the innovation it implements into the classroom has resulted in minority and low-income students excelling in academic performance as compared to their peer groups. As of the 2013-2014 school year, 72% of District 60's students were low-income, 77% were Hispanic, and 16% were black. These students deserve the opportunity to attend a school operated by LEARN, an organization that has proven to be adept at teaching minority and low-income students, improving their academic performance, and providing them with the academic foundation and ambition to attend college. Furthermore, merely because the commissioners never directly discussed the "best interests" factor during the public meeting does not mean their ultimate vote to grant LEARN's appeal was flawed. During the meeting, the commissioners discussed several

aspects of LEARN's proposal, and although the words "best interests" were never uttered, this undefined concept was clearly related to various discussions the commissioners had. Moreover, based on the Commission's written decision, it is clear that the Commission analyzed this factor. Therefore, the Commission's conclusion that LEARN's proposal was in the best interests of the students the school was designed to serve was not clearly erroneous.

¶ 114    In sum, the Commission properly found that LEARN's proposal was in compliance with the requirements of the Charter Schools Law and in the best interests of the students the school was designed to serve.

¶ 115                                    D. Due Process

¶ 116    District 60 next raises two due process challenges to the proceedings in front of the Commission. First, District 60 contends that the Commission improperly set conditions for granting LEARN's appeal, *i.e.*, the performance agreement. Second, District 60 contends that the Commission's approval of these conditions was made without providing the district an opportunity to review or address the adequacy of LEARN's alleged compliance.

¶ 117    The United States and Illinois Constitutions protect people against "governmental deprivations of life, liberty, or property without due process of law." *Village of Vernon Hills v. Heelan*, 2015 IL 118170, ¶ 31 (citing U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2). There are two types of due process: substantive and procedural. *In re Marriage of Miller*, 227 Ill. 2d 185, 197 (2007). "Whereas procedural due process governs the procedures employed to deny a person's life, liberty or property interest, substantive due process limits the state's ability to act, irrespective of the procedural protections provided." *Id.* In District 60's brief, it does not state which type of due process claim it is bringing, but based on its arguments, it is clear that its due process claim is procedural in nature as the district assails the fairness of the procedures used by the Commission. Whether a party's procedural due process rights have been violated presents a legal question we review *de novo*. *Heelan*, 2015 IL 118170, ¶ 31.

¶ 118    Although due process concerns permeate in administrative proceedings (*Abrahamson*, 153 Ill. 2d at 92), the Commission and ISBE argue that District 60 cannot assert a due process claim against the state given that it is itself a state entity. District 60 does not respond to this argument, and we agree with the Commission and ISBE.

¶ 119    District 60, as a school board, is a governmental agency, or rather a " 'municipal corporation,' created by the legislature and subject to its will." *East St. Louis Federation of Teachers, Local 1220 v. East St. Louis School District No. 189 Financial Oversight Panel*, 178 Ill. 2d 399, 412-13 (1997). Because school boards are created by statute, they are offices entirely under "the control of the legislature, 'which may at pleasure create or abolish them,' " as well as modify their duties. *Id.* at 413 (quoting *Hughes v. Traeger*, 264 Ill. 612, 616 (1914)). "The State's control over units of local government is without regard to due process guarantees," and "[t]he school board as an entity, therefore, cannot assert due process claims against the state." *Id.* Consequently, District 60, as a school board, cannot assert due process claims against the Commission, an entity of the state. See *id.* Accordingly, both of District 60's procedural due process claims fail.

¶ 120                              E. Open Meetings Act

¶ 121          District 60 next contends that the Commission committed multiple violations of the Open
        Meetings Act (Act) (5 ILCS 120/1 *et seq.* (West 2014)) during its April 21, 2015, public
        meeting where it voted to grant LEARN's appeal. Specifically, District 60 argues that (1) the
        chairman of the Commission, Greg Richmond, incorrectly asserted that all nine commissioners
        were present when only seven members were physically present, (2) the Commission
        improperly allowed two commissioners to vote telephonically without properly justifying their
        absence, (3) the Commission improperly utilized a roll call vote rather than a voice vote during
        the vote to allow the two commissioners' remote attendance, and (4) the Commission went into
        a closed session based on a motion that failed to sufficiently identify the exception in the Act
        allowing for a closed session. Based on these alleged violations, District 60 asserts that it was
        prejudiced and the proper remedy, and only one requested, is to render the Commission's
        decision to grant LEARN's appeal "null and void."

¶ 122          The Act represents a public policy initiative by our legislature that public bodies of the
        state, whose activities directly impact the lives of the citizens, should deliberate and take action
        in the open rather than in private. *Id.* § 1. To this end, the Act requires that "[a]ll meetings of
        public bodies" must be open to the public unless a specific exception applies. *Id.* § 2(a). A
        "meeting" is defined as "any gathering, whether in person or by video or audio conference,
        telephone call, *** of a majority of a quorum of the members of a public body held for the
        purpose of discussing public business." *Id.* § 1.02. A "public body" means "all legislative,
        executive, administrative or advisory bodies of the State *** and all other municipal
        corporations, boards, bureaus, committees or commissions of this State." *Id.* The provisions of
        the Act must be "strictly construed against closed meetings" (*id.* § 1(2)), and all final actions
        made by a public body be must be done in an open meeting. *Id.* § 2(e).

¶ 123          When a public body fails to comply with the provisions of the Act, "any person" may bring
        a civil action in the circuit court alleging noncompliance (*id.* § 3(a)), which is how District 60
        proceeded in this case. Although District 60, as a school board, could not assert due process
        claims against the Commission (see *East St. Louis Federation*, 178 Ill. 2d at 412-13), a
        "person," as defined by the Act, has been interpreted broadly. In *Paxson v. Board of Education
        of School District No. 87*, 276 Ill. App. 3d 912, 916, 918, 921 (1995), this court found that,
        consistent with the Act's purpose of requiring public bodies to act openly, the term a "person"
        should not be limited to only individuals, but rather should incorporate "a body politic."
        District 60, as a school board, is a body politic (see 105 ILCS 5/10-2 (West 2014)), and thus
        can allege violations of the Act. If the circuit court determines that a violation has occurred, it:

                "may grant such relief as it deems appropriate, including granting a relief by
                mandamus requiring that a meeting be open to the public, granting an injunction
                against future violations of this Act, ordering the public body to make available to the
                public such portion of the minutes of a meeting as is not authorized to be kept
                confidential under this Act, or declaring null and void any final action taken at a closed
                meeting in violation of this Act." 5 ILCS 120/3(c) (West 2014).

¶ 124          Although the circuit court's power to grant a remedy for violations of the Act is
        discretionary and ordinarily reviewed for an abuse of discretion (see *Parker v. Nichting*, 2012
        IL App (3d) 100206, ¶ 15), here, the circuit court did not dismiss District 60's counts of alleged
        violations of the Act on the merits. Because the court did not address the alleged violations of

the Act on their merits and thus did not utilize its discretion to grant or deny a remedy available under the Act, we will review the Commission's alleged violations *de novo*.

¶ 125    We first note that District 60 does not dispute that the Commission's vote to grant LEARN's appeal was a final action and that the vote occurred during an open session. And, of all the alleged violations of the Act, none of them concern a final action taken by the Commission in a closed session. The Act expressly states that the circuit court may only declare "null and void any final action taken at a closed meeting in violation of this Act." 5 ILCS 120/3(c) (West 2014); see also *Chicago School Reform Board of Trustees v. Martin*, 309 Ill. App. 3d 924, 936 (1999) (finding that, because the selection of a principal occurred at an open meeting, a party could not request nullification of that action because it was both "too extreme and not supported by the Open Meetings Act"); *Williamson v. Doyle*, 112 Ill. App. 3d 293, 300 (1983) (finding that the provision in a prior version of the Act "permitting the court to declare the action void refers by its terms only to a 'closed session' "). Thus, assuming *arguendo* that the Commission committed the alleged violations of the Act, we find that, based on the language of the Act, District 60's requested relief—declaring the Commission's decision to grant LEARN's appeal null and void—is improper.

¶ 126    Our conclusion is buttressed by the Act's legislative history. Prior to 1981, what is now known as the Act was called "AN ACT in relation to meetings." 1957 Ill. Laws 2892 (adding Ill. Rev. Stat. 1957, ch. 102, ¶ 41); Ill. Rev. Stat. 1979, ch. 102, ¶ 41. In this previous version of the Act, the only civil remedy the circuit court could issue upon a violation or anticipated violation of the Act was "a writ of mandamus requiring that a meeting be open to the public at large or issue such other appropriate order as will insure compliance with the provisions of this Act." Ill. Rev. Stat. 1979, ch. 102, ¶ 43. However, Public Act 82-378 (eff. Jan. 1, 1982) (amending Ill. Rev. Stat. 1979, ch. 102, ¶ 43) changed the civil remedies available for the circuit court to issue. As a result of the public act, upon a violation or anticipated violation of the Act:

"The court, having due regard for orderly administration and the public interest, as well as for the interests of the parties, may grant such equitable relief as it deems appropriate, including issuance of a writ of mandamus requiring that a meeting be open to the public, granting an injunction against future violations of this Act, ordering the public body to make available to the public such portion of the minutes of a meeting as is not authorized to be kept confidential under this Act, or declaring null and void any final action taken at a closed session in violation of this Act." Ill. Rev. Stat. 1981, ch. 102, ¶ 43(c).

The 1981 version of the statute is substantially the same as the current version.

¶ 127    During discussions of House Bill 411, which ultimately became Public Act 82-378 (eff. Jan. 1, 1982), in the House of Representatives, Representative Reilly stated that the bill "clarifies that action taken in closed session and only that action taken in closed session can be voided." 82nd Ill. Gen. Assem., House Proceedings, May 20, 1981, at 31 (statements of Representative Reilly). Representative Reilly later stated that "[t]he intent is to invalidate only final action improperly taken in secret" and "only the action that takes place in the closed meeting can be voided not action that takes place in the open meeting." *Id.* at 34, 59. It is clear that, based on the legislative history of the Act, the circuit court's power to declare a final action null and void is limited to only those situations where a final action occurred during a

closed meeting. Accordingly, even if District 60 could persuade us that the Commission committed multiple violations of the Act, we would not grant the district its requested relief.

¶ 128    Lastly, we note that District 60 could have followed the procedure set forth in section 3.5 of the Act and initiated a request for review with the "Public Access Counselor" of the Office of the Attorney General. 5 ILCS 120/3.5 (West 2014). Under this means of review, the Attorney General reviews whether a violation of the Act has occurred and then issues a binding opinion on the matter. *Id.* § 3.5(e); see also *American Federation of State, County, & Municipal Employees, Council 31 v. Illinois Labor Relations Board*, 2017 IL App (5th) 160046, ¶ 27 ("After review, the Attorney General must issue a binding opinion."). In that binding opinion, the Attorney General can direct the public body to take appropriate actions (5 ILCS 120/3.5(e) (West 2014); *American Federation*, 2017 IL App (5th) 160046, ¶ 27), including voiding final actions taken in open meetings. See, *e.g.*, 2016 Ill. Att'y Gen. Pub. Access Op. No. 16-015 (after finding that the Board of Trustees of the Village of Caseyville violated the Act by voting to amend and approve a settlement agreement without providing proper public notice, the Attorney General voided the original vote and directed the board of trustees to reconsider the matter at a properly noticed meeting); 2013 Ill. Att'y Gen. Pub. Access Op. No. 13-002 (after finding that the Chicago Park District Board of Commissioners violated the Act by voting to increase fees for admission to two museums without providing proper public notice, the Attorney General voided the original vote and directed the board of commissioners to reconsider the matter at a properly noticed meeting).

¶ 129    Had District 60 sought a remedy under section 3.5 of the Act (5 ILCS 120/3.5 (West 2014)) with the Public Access Counselor originally rather than initiating an action in the circuit court under section 3 of the Act (*id.* § 3), the Attorney General may have voided the Commission's vote on LEARN's appeal upon a finding of noncompliance with the Act. However, District 60 instead sought a remedy in the circuit court that it had no power to grant because the formal vote on the matter occurred during a public meeting. As a result, we have no choice but to reject its argument concerning the Commission's alleged violations of the Act. Although the circuit court dismissed the counts of District 60's complaint related to alleged violations of the Act for different reasons, the counts were properly dismissed. See *Vantage Hospitality Group, Inc. v. Q Ill Development, LLC*, 2016 IL App (4th) 160271, ¶ 54 (the appellate court may affirm the circuit court's judgment on any basis supported by the record).

¶ 130                          F. Dismissal of Remaining Counts

¶ 131    District 60 lastly contends that the other counts in its complaint should not have been dismissed. However, the district's arguments center around the improper dismissal of its claims concerning the Commission's alleged violations of the Act. As we have already discussed this issue in our foregoing analysis, we need not discuss it any further. But to the extent District 60 has challenged the propriety of the circuit court's dismissal of count IV of its complaint—the count which sought a declaratory judgment against LEARN, the Commission and ISBE—we find any such challenge forfeited for failing to cite any legal authority or develop a coherent legal argument. See Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017).

¶ 132                          III. CONCLUSION

¶ 133    Based on the foregoing, we affirm the judgment of the circuit court of Cook County, which had affirmed the decision of the Commission and dismissed counts II, III, and IV of District

60's complaint.

¶ 134        Affirmed.